23-5172-AFF

### AFFIDAVIT

I, Stacy Fleischmann, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I make this affidavit in support of an application for a criminal complaint charging Stavros PAPANTONIADIS, a/k/a "Steve Papantoniadis," with committing Forced Labor, in violation of 18 U.S.C. § 1589(a).

2.      I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations ("HSI") and have been so employed since 2009.  I am currently assigned to the Office of the Special Agent in Charge, Boston, Massachusetts.  I am authorized to investigate crimes involving violations of Title 18, Title 8, and Title 19 of the United States Code.  I am a "federal law enforcement officer" as defined in Rule 41(a)(2)(C) of the Federal Rules of Criminal Procedure, that is, a government agent who is engaged in enforcing the criminal laws of the United States and within a category of officers authorized by the Attorney General to request a search warrant.

3.      I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia, where I received training to become a federal agent.  I have received certification in the Criminal Investigator Training Program and the Immigration and Customs Enforcement ("ICE") Special Agent Training Program.  I have also received training relating to the trafficking of persons, including sex and labor trafficking, and other offenses.

4.      Based on my training and experience, I know that individuals can be trafficked for several purposes, including for their labor and to provide services for others.  This is often accomplished through force, threats of force, physical restraint, and/or abuse or threatened abuse of the law or legal process.  Traffickers can also obtain a victim's labor or services through the use

of debt bondage.  I am familiar with the federal criminal laws regarding human trafficking that are set forth in United States Code, Title 18, Chapter 77, including 18 U.S.C. § 1589(a) (Forced Labor).

5.      I have participated in investigations of human trafficking, human smuggling, alien harboring, border violations, drug and firearm trafficking, and related offenses.  Many of these investigations have had national or international connections, and many required me to work closely and share information and intelligence with members of other federal, state, and local law enforcement agencies.  I have debriefed, and continue to debrief, defendants, informants, and witnesses who have personal knowledge about human trafficking, including Forced Labor, and other crimes occurring in Massachusetts, nationally, and abroad.

6.      This affidavit supports a criminal complaint charging Stavros PAPANTONIADIS, a/k/a "Steve Papantoniadis," with committing Forced Labor, in violation of 18 U.S.C. § 1589(a). I am aware that the Forced Labor statute prohibits knowingly providing or obtaining a person's labor or services by prohibited means, specifically by one, or any combination, of the following means:

- by means of force, threats of force, physical restraint, or threats of physical restraint to that person or another;

- by means of serious harm or threats of serious harm to that person or another person;

- by means of the abuse or threatened abuse of law or legal process; or

- by means of any scheme, plan, or pattern intended to cause the person to believe that, if the person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint.[1]

18 U.S.C. §§ 1589(a)(1)–(4).

7.      "Abuse or threatened abuse of law or legal process" is defined as "use or threatened use of a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action."  18 U.S.C. § 1589(c)(1).

8.      "Serious harm" is further defined as "any harm, whether physical or nonphysical, including psychological, financial or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing."  18 U.S.C. § 1589(c)(2).

9.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show simply that there is sufficient probable cause for the criminal complaint and does not set forth all of my knowledge about this matter.

---

[1] Title 18, United States Code, Section 3298 states, "No person shall be prosecuted, tried, or punished for any non-capital offense . . . under section . . . 1589 (Forced Labor) . . . unless the indictment is found or the information is instituted not later than 10 years after the commission of the offense."

3

**PROBABLE CAUSE**

*PAPANTONIADIS Owns and Operates Stash's Pizza and Related Entities.*

10.     At times relevant to this investigation, Stavros PAPANTONIADIS, a/k/a "Steve Papantoniadis," owned (through a series of corporate entities) and operated a chain of pizzerias (hereinafter, collectively, "Stash's Pizzerias").   During the relevant period, the PAPANTONIADIS-owned Stash's Pizzerias have included:

        a.     Stash's Pizza of Dorchester, which is located at 612 Blue Hill Avenue, Dorchester, Massachusetts (hereinafter, the "Dorchester location");

        b.     Stash's Pizza of Roslindale, which is located at 330 Belgrade Avenue, Roslindale, Massachusetts (hereinafter, the "Roslindale location");

        c.     Boston Pizza Company, which was located at 1225 North Main Street, Randolph, Massachusetts (hereinafter, the "Randolph location");[2]

        d.     Boston Pizza Company, which was located at 69 Washington Street, Norwell, Massachusetts (hereinafter, the "Norwell location"); [3]

        e.     Stash's Pizza of Norwood, which was located at 254 Dean Street, Norwood, Massachusetts (hereinafter, the "Norwood location");[4]

        f.     Pacini's Italian Eatery, which was located at 836 Washington Street, Weymouth, Massachusetts (hereinafter, "Pacini's");[5] and

---

[2] The Randolph location was sold a third party no later than in or around September 2021.

[3] The Norwell location closed on or about November 30, 2010.

[4] The Norwood location was sold to a third party in or around May 2019.

[5] Pacini's closed on or about June 30, 2015.

      g.      Stash's Pizza of Onset Beach, which was located at 182 Onset Ave, East Wareham, Massachusetts (hereinafter, the "Onset location").[6]

*HSI Initiated a Criminal Investigation After Receiving Information about a U.S. Department of Labor Civil Investigation.*

11.      On or about March 24, 2017, the U.S. Department of Labor, Wage and Hours Division ("DOL-WHD"), brought a civil suit against PAPANTONIADIS and his pizza businesses for overtime wage violations.  On or about March 27, 2019, that civil suit was resolved by a consent decree.  Several of the forced labor victims discussed herein provided sworn statements and had claims against Stash's Pizzerias or PAPANTONIADIS, or both, in that civil case.  Each of the victims identified herein, except Victim 5, received compensation for back wages and liquidated damages through PAPANTONIADIS's settlement with DOL-WHD.

12.      After the initiation of the DOL-WHD investigation, HSI and agents from the U.S. Department of Labor, Office of the Inspector General ("DOL-OIG") opened a criminal investigation into PAPANTONIADIS's use of forced labor.  As part of that investigation, HSI and DOL-OIG agents have interviewed many of PAPANTONIADIS's former employees.  Based on the information those former employees provided and other evidence described herein, there is probable cause that PAPANTONIADIS committed Forced Labor, in violation of 18 U.S.C. § 1589(a) (sometimes colloquially known as "labor trafficking").  PAPANTONIADIS has engaged in a course of conduct targeting several of his then-employees, which included the following features:

---

[6] The Onset location was sold in or around May 2022.

- PAPANTONIADIS recruited and targeted workers who lacked immigration status and authorization to work in the United States;

- PAPANTONIADIS employed the victims at depressed and/or no wages, and demanded that they work, in most cases, approximately 6 to 7 days per week, far more than 8 hours per day, often without breaks, and without overtime compensation;

- PAPANTONIADIS routinely withheld wages that were due and owing to victims and refused to pay those wages, even when requested;

- PAPANTONIADIS threatened to alert immigration authorities and/or law enforcement to have the victims detained and/or removed from the United States;

- PAPANTONIADIS threatened to, and on at least one occasion did, call police and told victims that the police would believe him as a businessperson and not the victims, who lacked immigration status and were members of racial or ethnic minority groups;

- PAPANTONIADIS used acts of violence and threats of violence to scare employees and ensure their compliance with his workplace demands; and

- When presented with requests for breaks, days off, overdue wages, raises, or upon learning that a victim planned to quit, PAPANTONIADIS exerted control over the victims through the methods described above and others including (1) threats of termination directed at victims whose immigration status made it difficult for them to obtain other employment; (2) extensive use of video surveillance to monitor and subsequently reprimand victims for what he perceived as non-compliance with his workplace demands; (3) pervasive verbal harassment, including derogatory

6

statements about the victims' respective national origin, religion, sexual orientation, and immigration status; and (4) sexual harassment.

13.     Through the aforementioned course of conduct, PAPANTONIADIS forced victims to continue working for him for more hours and days with less pay than was lawful. PAPANTONIADIS's criminal conduct enabled him to obtain a substantial financial benefit and an advantage over other businesses in the local pizza market.  He could and did operate the Stash's Pizzerias with fewer and cheaper workers over whom he exercised significant control, all of which reduced his businesses' labor and operating costs.

14.     I am also aware that some potential victims left Stash's Pizzerias very quickly and other victims stopped working for PAPANTONIADIS, but only after PAPANTONIADIS forced their labor for a period of time.  In other words, the fact that eventually some victims were able to leave does not mean that they were not forced prior to departing Stash's Pizzerias.

*Victim 1*

15.     PAPANTONIADIS forced Victim 1 to provide labor services for Stash's Pizzerias over a nearly 14-year period.[7]  PAPANTONIADIS's forced labor scheme targeting Victim 1 involved, among other things, violent assaults, the threat of violence, and the repeated and

---

[7] Victim 1 is a citizen of a North African country.  In 1999, he entered the United States on a B-2 visitor visa.  As a result, he lacked status and authorization to work.  During this investigation, the Department of Homeland Security has helped Victim 1 obtain immigration benefits.  Specifically, HSI agents helped Victim 1 receive "Continued Presence."  In addition, HSI has submitted certification to enable Victim 1 to obtain T and U visas.

I have reviewed medical records which corroborate Victim 1's statements concerning his experience at Stash's Pizzerias.  Based on this corroboration, and the fact that his statements are both internally consistent and consistent with those of other victims, I believe that Victim 1 is a reliable source of information.

pervasive threat of reporting Victim 1 to immigration authorities to cause him to be removed from the United States.

16.    Victim 1 disclosed the following regarding his experience at Stash's Pizza. However, the following is neither a verbatim transcript nor complete summary of all the information Victim 1 disclosed:

        a.    From 2001 through 2015, Victim 1 worked for PAPANTONIADIS at several Stash's Pizzerias locations.  However, primarily, Victim 1 worked at the Dorchester location.  Victim 1 worked 12 hours per day, 7 days per week.  He worked between 84 and 119 hours per week.[8]  Victim 1 worked even when he was sick.  He is a practicing Muslim, and he was not permitted to stop working for Ramadan.  Nor did he take a vacation or leave the United States once he began working for PAPANTONIADIS.  Victim 1 did many different tasks in the restaurants, including making pizzas.  At some point during his tenure with Stash's Pizzerias, he worked as a manager.

        b.    PAPANTONIADIS made derogatory comments about Victim 1's religion. PAPANTONIADIS would call Victim 1 a "fucking Muslim."

        c.    Victim 1 felt like he had to continue working for PAPANTONIADIS because he was an undocumented immigrant, and he believed that PAPANTONIADIS would report him to the police or immigration authorities if he did not continue to work.

        d.    PANATONIADIS assaulted Victim 1 several times.  Victim 1 was afraid of PAPANTONIADIS.  Set forth below are descriptions of assaults that Victim 1 disclosed during the investigation:

---

[8] Victim 1 also disclosed that worked between 87 and 119 hours per week.

- Victim 1 missed a day of work.  The next day, PAPANTONIADIS pushed him and caused him to fall to the floor.  PAPANTONIADIS then called Victim 1 a "fucking Muslim."

- On a day in or around 2007, when Victim 1 arrived at the restaurant, another employee asked Victim 1 to go to the basement to speak to PAPANTONIADIS. When Victim 1 got to the basement, PAPANTONIADIS kicked Victim 1 in the genitals.  Victim 1 stated that the pain was so bad that he started to cry.  Victim 1 then took the bus to Massachusetts General Hospital.  PAPANTONIADIS called Victim 1 and told him that if he did not return, he would kill Victim 1.  Victim 1 had surgery on his genital region.[9]  After the surgery, Victim 1 had a catheter implanted.  Victim 1 stated that this injury continued to cause him pain until at least 2021.  During the 3-week recovery period, PAPANTONIADIS would call Victim 1 and threaten to kill him and call immigration if he did not return to work. PAPANTONIADIS also threatened to call the police.  Victim 1 believed that PAPANTONIADIS knew police officers because police officers often visited the restaurant and PAPANTONIADIS gave them free food.

- After the incident during which PAPANTONIADIS kicked Victim 1 in the genitals, PAPANTONIADIS entered the kitchen of one of the Stash's Pizza locations with

---

[9] Medical records from Massachusetts General Hospital confirm that Victim 1 had the surgical procedure as he described.  The records indicate that the procedure was to address a preexisting condition of varicoceles.  The records also indicate that the procedure was performed in February 2009.  The records further indicate that in August 2008, Victim 1 denied any recent trauma or injury to his scrotum, and there is no mention of recent trauma in the records regarding the February 2009 surgical procedure.

5 or 6 friends.  PAPANTONIADIS then slapped Victim 1 in the face and broke his glasses.

- On another occasion,  PAPANTONIADIS hit Victim 1 in the ear and choked him so hard that his tongue stuck out of his mouth.  Victim 1 fell to the floor and PAPANTONIADIS continued to choke him.  The assault left marks on his neck and PAPANTONIADIS broke his glasses again.  PAPANTONIADIS yelled, "You fucking Muslim," while he was choking Victim 1.

- When an employee did not show up for work, PAPANTONIADIS told Victim 1 that he could not leave.  Victim 1 did not show up for work the next day.  When Victim 1 finally returned to work, PAPANTONIADIS choked him and pushed him into a chair.  As a result, his glasses fell off  and broke when Victim 1 accidently stepped on them.  During the assault, PAPANTONIADIS yelled, "Fucking Muslim.  Not coming to work.  I will kill you."

- On another occasion, PAPANTONIADIS hit Victim 1 on his ear and mouth.  PAPANTONIADIS broke his upper and lower teeth.  Victim 1 had to go to the dentist and have all of his teeth removed.  Victim 1 now has dentures.[10]

---

[10] Medical records from Massachusetts General Hospital confirm that he had lost or had all of his teeth extracted as of September 2008.

*PAPANTONIADIS Engaged in an Extensive Forced Labor Scheme Targeting Several Other Undocumented Employees.*

*Victim 2*

17.     Victim 2 disclosed the following information regarding his experience at Stash's Pizzerias.[11]   The following is neither a verbatim transcript nor complete summary of all the information Victim 2 disclosed in connection with this investigation:

a.     Victim 2 worked for PAPANTONIADIS beginning around July of 2013 and continuing through November 2015.  Victim 2 worked primarily at the Norwood location, but he also worked at the Dorchester, Roslindale, and Onset Beach locations.  Victim 2 made pizzas and performed other tasks.

b.     Victim 2 worked 7 days a week without receiving a day off, often totaling approximately 80 hours a week.  Initially, PAPANTONIADIS told Victim 2 that the 7-day work week would be temporary until PAPANTONIADIS hired another worker.  However, Victim 2

---

[11] I have interviewed Victim 2.  Victim 2 considered filing his own lawsuit against PAPANTONIADIS for employment discrimination based on Victim 2's sexual orientation.

Victim 2 is a Salvadoran national.  He entered the United States without inspection (i.e., illegally).  As a result, he lacked status and authorization to work.  During this investigation, the Department of Homeland Security has helped Victim 2 obtain immigration benefits.  Specifically, HSI agents helped Victim receive "Continued Presence," which is a temporary immigration status for potential victims of human trafficking.  This status enables the recipient to remain in the United States, obtain employment, and become eligible to receive federal assistance benefits all for the duration of law enforcement's human trafficking investigation.

I have reviewed employment records, including wage checks, and a police report which corroborate Victim 2's statements concerning his experience at Stash's Pizzerias.  Based on this corroboration, and the fact that his statements are both internally consistent and consistent with those of other victims, I believe that Victim 2 is a reliable source of information.

11

observed that when new people were hired, they never lasted very long because of the way that PAPANTONIADIS treated employees.  As a result, Victim 2 was required to continue working a 7-day work week.

c.      Each day Victim 2 would start working between 8:00 a.m. and 10:00 a.m. Often, he would not be able to eat food until around 3:00 p.m. or 4:00 p.m.  PAPANTONIADIS used video surveillance to monitor the restaurants remotely.  If he saw Victim 2 sitting down to eat or drink coffee, PAPANTONIADIS would call Victim 2 to reprimand him.[12]

d.      Victim 2 earned $11.00 per hour.  Occasionally, Victim 2 was paid between $12.00 and $14.00 per hour.  However, he did not receive overtime compensation.  Nor was Victim 2 paid for all the hours that he worked.

e.      Victim 2 asked for time off, but PAPANTONIADIS would not allow it.  For example, Victim 2 had a problem with a toenail that required medical treatment.  Victim 2 asked PAPANTONIADIS if he could have the day off to see a doctor.  PAPANTONIADIS denied his request for time off and said that Victim 2 would have to take care of it after the restaurant closed, which likely would have been around 10:00 p.m.[13]  Victim 2 said that he could not go to the hospital at 10:00 p.m.  PAPANTONIADIS told him to visit the doctor the next morning and return to work in the afternoon.  The next morning, Victim 2 went to the emergency room and was told that he needed surgery.  Victim 2 sent PAPANTONIADIS a text message with photos of his toe.

---

[12] Several of PAPANTONIADIS's former employees also reported that there were cameras installed throughout the restaurants and that PAPANTONIADIS watched the employees on his iPhone when he was not physically present.

[13] Based on my training and experience, the effect of PAPANTONIADIS's actions was to deny Victim 2 access to immediate medical care.

In response to the text, PAPANTONIADIS accused Victim 2 of lying about his medical condition. That same day, at around 1:30 p.m. or 2:00 p.m., Victim 2 had surgery on his toe. As part of the surgery, Victim 2 received anesthesia.[14] After the surgical procedure, the medical staff told Victim 2 to rest. However, about an hour post-surgery, Victim 2 returned to work at the Norwood location. PAPANTONIADIS required Victim 2 to continue working. Victim 2 worked in sandals because he could not put his surgically repaired toe in his work boots.

        f.      PAPANTONIADIS threatened Victim 2 and other workers who were from Brazil and Guatemala. For example, when one of the foreign national employees would ask for time off from work, PAPANTONIADIS would mention their immigration status. PAPANTONIADIS would deny foreign national employees' requests for time off, often ending the conversation by saying, "Fucking immigrants, I'm not here for you."

        g.      PAPANTONIADIS was violent and Victim 2 was afraid of him. Victim 2 was aware that PAPANTONIADIS threw things if food items did not come out correctly; that PAPANDTONIADIS had hit a Brazilian employee (Victim 2 was not present for the assault but came to work later that day and heard about it);[15] and that PAPANTONIADIS had grabbed an employee when the employee wanted to quit.[16]

        h.      After a while, Victim 2 wanted to leave Stash's Pizzerias. Victim 2 wanted to leave because of PAPANTONIADIS's attitude, and the fact that Victim 2 had to work so many

---

[14] Medical records confirm that on or about October 7, 2015, Victim 2 had a surgical procedure to repair an in-grown toenail.

[15] Victim 2 identified the victim of the assault. I have interviewed the person who Victim 2 identified—i.e., Victim 5, who is discussed herein—and confirmed that the assault occurred.

[16] Victim 2 also identified this employee.

hours with no breaks, and he had not been paid for all his hours.  Nevertheless, Victim 2 did not leave when he wanted to leave.

   i. In the beginning of November 2015, Victim 2 tried to leave Stash's Pizzerias for a job at another pizzeria located in Somerville, Massachusetts (hereinafter, the "Somerville Pizzeria").  Believing that the Somerville Pizzeria manager would not know PAPANTONIADIS, Victim 2 told the manager that he had been working at Stash's Pizza in Norwood.  The manager of the Somerville Pizzeria offered Victim 2 a job and told him to give Stash's Pizza notice that he would be leaving.

   j. A few days later, before he quit Stash's Pizza, PAPANTONIADIS called Victim 2 to a meeting during which during a co-worker translated.  At that meeting, Victim 2 told PAPANTONIADIS to pay him for his last week and indicated that he would then leave Stash's Pizzerias.  PAPANTONIADIS said he did not know how many hours Victim 2 had worked.  PAPANTONIADIS also said he knew where Victim 2 had been looking to work and that he (PAPANTONIADIS) had given Victim 2 a good recommendation.  Victim 2 believed PAPANTONIADIS was joking when he stated that he had recommended Victim 2 to the new putative employer.  PAPANTONIADIS then threatened Victim 2, stating that he knew where Victim 2 lived.  He also implicitly threatened to report Victim 2 to law enforcement, stating he knew that Victim 2 and Victim 2's brother drove vehicles without having driver's licenses.[17] PAPANTONIADIS added that he knew a lot of police officers, and those officers would believe

_____

[17] As further described herein, PAPANTONIADIS had a practice of falsely reporting undocumented employees to law enforcement, including lying to police about Victim 5 and Victim 7.

PAPANTONIADIS because he was a businessman.  Victim 2 believed what PAPANTONIADIS said about police officers because PAPANTONIADIS gave a 20% to 30% discount to police officers and donated free food for police and fire department events.  PAPANTONIADIS also stated words to the effect of, "I also don't know if you are a man or what you are, but I am a man and I am a citizen of this country."  Victim 2 identifies as gay, and in context, Victim 2 understood this to be a derogatory comment about his sexual orientation.

k.       Victim 2 had seen PAPANTONIADIS get very angry and violent when other workers attempted to quit.  To calm PAPANTONIADIS and avoid an eruption, Victim 2 told him that he would stay and work.[18]  Victim 2 then backed up, turned around, and walked out of the door and never returned to work at the Norwood location.

l.       After the confrontation with PAPANTONIADIS, Victim 2 returned to the Somerville Pizzeria, where previously he had been offered a job.  However, when he arrived, the owner of the Somerville Pizzeria told Victim 2 that he did not have any work for Victim 2.[19]  The owner gave no other explanation for why he was reneging on his prior offer of employment.

m.       Victim 2 is still afraid of PAPANTONIADIS.  Victim 2 moved to a new home because he knew that PAPANTONIADIS knew his prior address.

---

[18] Based on the information that Victim 2 disclosed, I believe Victim 2 concluded that PAPANTONIADIS was threatening to use the legal process against Victim 2.  Specifically, Victim 2 believed PAPANTONIADIS would alert law enforcement to have Victim 2 removed from the country.  Based on these facts, I believe that PAPANTONIADIS's threats were designed to cause Victim 2 to continue working at Stash's Pizzerias.

[19] Based on the information that Victim 2 disclosed, I believe that Victim 2 suspects that PAPANTONIADIS interfered with his new job at the Somerville Pizzeria to cause Victim 2 to continue working at Stash's Pizzerias.

*Victim 3*

18.     Victim 3 disclosed the following information regarding his experience at Stash's Pizzerias.[20]   The following is neither a verbatim transcript nor complete summary of all the information Victim 3 disclosed in connection with this investigation:

    a.      Victim 3 worked for PAPANTONIADIS from in or around 2009, through in or around 2017.  Victim 3 was hired by PAPANTONIADIS's wife's brother.  However, from the beginning he knew that PAPANTONIADIS was the boss.  When he was hired, he did not have to provide any documents demonstrating that he was authorized to work in the United States.

    b.      Victim 3 worked at the Norwell, Norwood, and Roslindale locations.  He worked 6 days a week.  His weekday hours were 10:00 a.m. to 10:00 p.m.  On the weekends, he worked 10:00 a.m. to 11:00 p.m.  He was not allowed to take breaks.  PAPANTONIADIS monitored the employees via a surveillance camera network.  Whenever an employee such as Victim 3 would sit down, PAPANTONIADIS would call the restaurant and reprimand the employee.

---

[20] Victim 3 is a Brazilian national.  He entered the United States without inspection (i.e., illegally).  As a result, he lacked status and authorization to work.  During this investigation, the Department of Homeland Security has helped Victim 3 obtain immigration benefits.  Specifically, HSI agents helped Victim receive "Continued Presence," which is a temporary immigration status for potential victims of human trafficking.  This status enables the recipient to remain in the United States, obtain employment, and become eligible to receive federal assistance benefits all for the duration of law enforcement's human trafficking investigation.

c.      PAPANTONIADIS paid Victim 3 between $12.00 and $16.00 per hour.  He never paid overtime.  At first, PAPANTONIADIS paid Victim 3 in cash; later, PAPANTONIADIS paid half in cash, half by check.[21]

d.      When DOL-WHD began its civil investigation, PAPANTONIADIS moved Victim 3 from the Norwood location to the Roslindale location.  PAPANTONIADIS became increasingly hostile, telling others that Victim 3 was a snitch for sharing information with DOL-WHD, and directing Victim 3 to lie to the DOL-WHD investigators.  Starting around this same time, PAPANTONIADIS more frequently told Victim 3 that he knew Victim 3 lacked immigration status in the United States.

e.      PAPANTONIADIS's threats targeting undocumented employees and violence caused Victim 3 to fear PAPANTONIADIS and therefore continue working for him.  Whenever an undocumented employee indicated that he or she wanted to quit, PAPANTONIADIS would make references to the employee's immigration status, threaten to have him or her deported, and withhold his or her remaining wages.  Victim 3 saw PAPANTONIADIS violently attack Victim 5 when Victim 5 tried to quit in July 2013.  PAPANTONIADIS's violence had a profound impact on Victim 3, causing him to fear PAPANTONIADIS and the consequences of attempting to quit.

---

[21] PAPANTONIADIS's payroll records from 2016 indicate that Victim 3 was paid $11.00 per hour and $16.00 per overtime hour.  The records indicate that Victim 3 worked between approximately 50 and 70 hours per week.  However, victims and witnesses have told investigators that PAPANTONIADIS falsified payroll records, at least in part, to obstruct the DOL investigation.

*Victim 4*

19.     Victim 4 disclosed the following information regarding her experience at Stash's Pizzerias.[22]   The following is neither a verbatim transcript nor complete summary of all the information Victim 4 disclosed in connection with this investigation:

a.      Victim 4 worked for PAPANTONIADIS from in or around May 2013, through in or around September 2016.  Victim 4 found Stash's Pizzerias through an online job posting.  When she went to the Norwood location to inquiry about the vacancy, she spoke to PAPANTONIADIS.  He asked if she could work 7 days per week and start right away.  Victim 4 submitted to PAPANTONIADIS's request.  For 1 year, Victim 4 worked 365 consecutive days. PAPANTONIADIS refused to give Victim 4 a day off.   However, after about a year, PAPANTONIADIS allowed Victim 4 to work 6 days per week.

b.      Victim 4 did primarily food preparation, cooking, and cleaning at the Norwood location.  Generally, she worked 49 to 50 hours per week.  She was paid $9.00 per hour and did not receive overtime.  She was paid in cash.  After 1 year, PAPANTONIADIS paid Victim 4 an extra $1.00 per hour.

c.      PAPANTONIADIS would often omit hours from Victim 4's paycheck. When she was missing several hours, she would send him a text asking for the additional wages.

---

[22] Victim 4 is a Salvadoran national.  She entered the United States in 2003.  When she worked at Stash's Pizzerias, she lacked immigration status and authorization to work.  During this investigation, the Department of Homeland Security has helped Victim 4 obtain immigration benefits.   Specifically, HSI agents helped Victim 4 obtain "Continued Presence," which is a temporary immigration status for potential victims of human trafficking.  This status enables the recipient to remain in the United States, obtain employment, and become eligible to receive federal assistance benefits all for the duration of law enforcement's human trafficking investigation.

PAPANTONIADIS would never respond to the texts.  When she would confront him in person, PAPANTONIADIS make veiled references to her immigration status.

    d.      PAPANTONIADIS had cameras throughout the restaurant that he used to ensure that the employees never sat down.

    e.      PAPANTONIADIS's threats targeting undocumented employees and violence caused Victim 4 to fear PAPANTONIADIS and therefore continue working for him. When PAPANTONIADIS was mad at the employees, he would boast about his ability to call immigration authorities on the employees.  Victim 4 also witnessed PAPANTONIADIS's violent attack on Victim 5.  Seeing PAPANTONIADIS attack another employee made her fear what he could do to her if she tried to leave.

    f.      Ultimately, Victim 4 was able to leave PAPANTONIADIS by telling him that she was pregnant, and that her doctor had ordered her not to continue working during her pregnancy.  In addition, she falsely assured PAPANTONIADIS that she would return after her pregnancy.

    *Victim 5*

20.    Victim 5 disclosed the following information regarding his experience at Stash's Pizzerias.[23]  The following is neither a verbatim transcript nor complete summary of all the information Victim 5 disclosed in connection with this investigation:

---

[23] Victim 5 is a Brazilian national.  In October 2012, entered the United States on a tourist visa and stayed beyond the authorized period.  During this investigation, the Department of Homeland Security has helped Victim 5 obtain immigration benefits.  Specifically, HSI agents helped Victim 5 obtain "Continued Presence," which is a temporary immigration status for potential victims of human trafficking.  This status enables the recipient to remain in the United

a.      Victim 5 began working for Stash's Pizzerias about a week after arriving in the United States.  He left Stash's Pizzerias approximately 10 months later in August 2013.

b.      Victim 5 worked at the Norwood and Norwell locations.  He worked as a pizza chef.  He worked alongside Victim 3, who often translated for Victim 5.

c.      At the beginning, Victim 5 worked 50 to 60 hours per week.  By the time he left, he was working approximately 72 hours per week.  Generally, he worked from 9:00 a.m. to 11:00 p.m.  He was paid between $9.00 and $10.00 per hour.  Victim 5 never received overtime compensation.

d.      There were times when PAPANTONIADIS required Victim 5 to work when he otherwise would not have.  When Victim 5 learned that his father-in-law passed away, he asked for time off, but PAPANTONIADIS only permitted him to have a 15-minute break before returning to work.

e.      Victim 5 decided to quit because he found a better job.  He told PAPANTONIADIS that he would find a replacement before leaving.  Victim 2 was the replacement.  However, PAPANTONIADIS got very angry when he learned that Victim 5 was often leaving work early to go to his new job.  PAPANTONIADIS told Victim 5 that Victim 5 was not going to leave.  During an argument about Victim 5's departure, PAPANTONIADIS attacked Victim 5.[24]  Victim 5 had to run to safety in the parking lot.  PAPANTONIADIS called

---

States, obtain employment, and become eligible to receive federal assistance benefits all for the duration of law enforcement's human trafficking investigation.

[24] I have reviewed photos of Victim 5's injuries and Victim 5's medical records which corroborate his statements about PAPANTONIADIS's attack.

the police who arrived and directed Victim 5 not to return to the restaurant.[25]   Later, an officer accompanied Victim 5 to the restaurant to try to retrieve his cell phone and belongings.

*Victim 6*

21.    Victim 6 disclosed the following information regarding his experience at Stash's Pizzerias.[26]   The following is neither a verbatim transcript nor complete summary of all the information Victim 6 disclosed in connection with this investigation:

---

[25] As described above, Victim 4 witnessed PAPANTONIADIS's attack on Victim 5. Victim 4 indicated that PAPANTONIADIS lied to police about the altercation by falsely telling police that he (PAPANTONIADIS) only hit Victim 5 because Victim 5 was holding a knife.

[26] Victim 6 is a Brazilian national.  He entered the United States on a visitor visa on June 6, 2013.  Victim 6 remained in the United States beyond the period authorized by his visa.  As a result, he lacked status and authorization to work.  During this investigation, the Department of Homeland Security has helped Victim 6 obtain immigration benefits.  Specifically, HSI agents helped Victim receive "Continued Presence."

In addition, HSI has submitted certification to enable Victim 6 to obtain T and U visas.  T non-immigrant status ("T visa") is a temporary immigration benefit that enables certain victims of a severe form of trafficking in persons to remain in the United States for an initial period of up to 4 years if they have complied with any reasonable request for assistance from law enforcement in the detection, investigation, or prosecution of human trafficking or qualify for an exemption or exception.

The U non-immigrant status ("U visa") is set aside for victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity.  Congress created the U non-immigrant visa with the passage of the Victims of Trafficking and Violence Protection Act (including the Battered Immigrant Women's Protection Act) in October 2000.  The legislation was intended to strengthen the ability of law enforcement agencies to investigate and prosecute cases of domestic violence, sexual assault, trafficking of non-citizens and other crimes, while also protecting victims of crimes who have suffered substantial mental or physical abuse due to the crime and are willing to help law enforcement authorities in the investigation or prosecution of the criminal activity. The legislation also helps law enforcement agencies to better serve victims of crimes.

a.      In or around June 2013, Victim 6 left Brazil and entered the United States on a tourist visa.[27]   He arrived on a Monday.   By Wednesday, he began working for PAPANTONIADIS at Pacini's.   Before starting at Pacini's, Victim 6 did not complete a job application or any other paperwork.   Nor did he provide a social security number.   Victim 6 believed PAPANTONIADIS knew which employees had legal status authorizing them to work in the United States because PAPANTONIADIS owned the business and the employees' immigrations status was something Victim 6 believed PAPANTONIADIS would have known.

b.      Victim 6 worked from 10:00 a.m. to 9:00 p.m., 6 days per week.   He was paid $12.00 per hour.   Victim 6 cleaned, washed dishes, and did food preparation work.   Initially, another employee supervised Victim 6.   However, a few months after Victim 6 began working at Pacini's, that employee quit following a fight with PAPANTONIADIS about money.   After that, Victim 6 had the key to the restaurant, and was responsible for opening the restaurant in the morning.   He arrived every day around 8:30 or 9:00 a.m. and would not leave until the restaurant closed at 9:00 p.m. or later.

c.      PAPANTONIADIS came to the restaurant every morning to pick up the previous day's cash proceeds.   Victim 6 spoke to PAPANTONIADIS every morning and eventually PAPANTONIADIS began to text Victim 6 directly.

---

[27] A tourist visa does not authorize the visa holder to work in the United States.  Employers are required to know the work authorization status of their employees.  It is unlawful for an employer to hire an individual present in the United States under a tourist visa.

d.     PAPANTONIADIS told Victim 6 that he (PAPANTONIADIS) killed someone in a car accident.  Victim 6 stated that PAPANTONIADIS "put it out there" that he had spent time in jail.  As a result, PAPANTONIADIS told Victim 6 not to mess with him.[28]

e.     Typically, Victim 6 did not have to work on Wednesdays and sometimes Sunday mornings.  However, on those days he was still required to open the restaurant.  Victim 6 was not paid for opening the restaurant on his days off.  Moreover, if Victim 6 had to take time for personal issues, such as a doctor's appointment, he would not tell PAPANTONIADIS.  He would open the restaurant, leave for his appointment, and go right back to the restaurant.

f.     After about a year at Pacini's, Victim 6 decided that he had had enough and quit.  Victim 6 did not tell PAPANTONIADIS that he was quitting; he just stopped showing up for work.  Around this time, PAPANTONIADIS started threatening Victim 6 that he would call the police and immigration authorities.  Then, PAPANTONIADIS offered to pay Victim 6 $14.00 to $16.00 per hour.  Victim 6 agreed to return to work because he did not have another job.

g.     After Victim 6 returned, business began to decline at Pacini's.  As a result, PAPANTONIADIS had Victim 6 work at other Stash's Pizzerias locations—primarily making pizzas and cooking.  Eventually, Victim 6 stopped working at Pacini's altogether.

h.     PAPANTONIADIS sexually harassed and abused Victim 6 during his tenure at Stash's Pizzerias.  Victim 6 became friends with Victim 2, who worked at the Norwood location.  Victim 2 was gay and PAPANTONIADIS became very angry when he learned that

---

[28] I have reviewed criminal history records confirming that in 1998, PAPANTONIADIS was convicted of Homicide by Motor Vehicle in Suffolk County Superior Court.

Victim 2 and Victim 6 were friends.  PAPANTONIADIS began yelling at Victim 6 and calling him the homophobic slur "faggot."  PAPANTONIADIS treated Victim 2 the same way.

      i.     In another sexual harassment incident that occurred at the Roslindale location, PAPANTONIADIS and two other men, who were not employees, were sitting at a table in the front of the restaurant.  When Victim 6 went to the front of the restaurant to clean the tables, PAPANTONIADIS asked Victim 6, "If I cum into this glass, would you drink it?"[29] PAPANTONIADIS pointed to a glass and told Victim 6 he would pay him if he drank semen from the glass.

      j.     PAPANTONIADIS was physically abusive to other employees.  On one occasion at the Roslindale location, PAPANTONIADIS threw a hot pizza and box at a Brazilian employee because he did not like the way the employee had made the pizza.  Victim 6 also saw PAPANTONIADIS throw pens and knives at employees on other occasions. PAPANTONIADIS's behavior made Victim 6 very afraid of PAPANTONIADIS and he feared that PAPANTONIADIS would hurt him.  PAPANTONIADIS was always angry.

      k.     PAPANTONIADIS also touched him with a frequency that made him uncomfortable.  PAPANTONIADIS would approach Victim 6 from behind, grabbing Victim 6's buttocks and pinching his nipples.  Repeatedly, Victim 6 told PAPANTONIADIS to stop this behavior.  The unwanted touching became worse during the last few weeks that Victim 6 worked at the Roslindale location.

      l.     While Victim 6 was working at Stash's Pizza's Roslindale location, Victim 6 again decided to quit.  PAPANTONIADIS became very angry when he learned that Victim 6

---

[29] Based on my training and experience, I know that "cum" is a slang term for semen.

wanted to quit.  PAPANTONIADIS yelled at Victim 6, threw papers in his face, and threatened to call the police and immigration authorities.  Victim 6 believed that PAPANTONIADIS would call the police or immigration authorities to report him.  PAPANTONIADIS had previously told Victim 6 that he called immigration authorities on another Brazilian employee who was subsequently deported.[30]   PAPANTONIADIS would often mention this to Victim 6, especially when PAPANTONIADIS was angry.

        m.      Shortly after Victim 6 disclosed his desire to quit, PAPANTONIADIS told Victim 6, "if you quit, I know your address."  Victim 6 stated that he was afraid of PAPANTONIADIS because he (PAPANTONIADIS) did in fact know where he lived.

        n.      Victim 6 reported that the foregoing incident during which PAPATONIADIS threw papers at Victim 6 was a breaking point.  Victim 6 had begun thinking about quitting again but was afraid of PAPANTONIADIS and what he would do to him if he quit.  Victim 6 indicated that he eventually could not take working for PAPANTONIADIS and again stopped showing up.

        o.      After quitting, Victim 6 contacted PAPANTONIADIS to request that PAPANTONIADIS send him his last paycheck.  Victim 6 estimated that he was owed between

---

[30] Other victims and witnesses have disclosed information about this same event.  However, I have confirmed that a former PAPANTONIADIS employee was arrested by ICE and deported to Guatemala, not Brazil, in 2016.  I have not confirmed whether PAPANTONIADIS reported the employee to ICE or caused ICE to act.  Regardless of whether PAPANTONIADIS was responsible for the removal of this other Guatemalan employee, it is significant that employees were aware that another employee had been deported and that PAPANTONIADIS took credit for that deportation because the information served as an ongoing threat against his current employees who lacked immigration status.

$800.00 and $900.00.  PAPANTONIADIS told Victim 6 to come to the restaurant to pick up the check.[31]

        p.       Around May 2015, about a week after Victim 6 left the Roslindale location, Victim 6 heard that Pacini's had closed.  Victim 6 reported that PAPANTONIADIS began calling and sending him text messages, asking Victim 6 to return to work.  Victim 6 was still very afraid because PAPANTONIADIS knew where he lived.

        q.       Because Victim 6 still had not received his final check, he decided to sue PAPANTONIADIS in small claims court to recover the funds from his last paycheck.  After PAPANTONIADIS learned about the lawsuit, he began sending Victim 6 text messages stating, "I'm going to kill you"; "I'll call the police and Immigration"; and "I'm going to send people to your house."

22.      On the day of the small claims court hearing, Witness A,[32] PAPANTONIADIS's friend, appeared at the courthouse with a female attorney who spoke Portuguese.[33]   I have reviewed court records that identify PAPANTONIADIS's attorney of record; I have confirmed that she is an attorney who is licensed to practice in Massachusetts (hereinafter, "Attorney 1").  Open-source searches revealed that Attorney 1 has an office next to the Dorchester location.  At

---

[31] I am aware that other victims reported not receiving wages after leaving PAPANTONIADIS's employment, which I believe was an attempt to cause them to keep working there.

[32] I have interviewed Witness A.  To protect his identity, I have omitted his name.  Based on my interview of Witness A, I know that he has had an ongoing business relationship with PAPANTONIADIS and his associates.

[33] Court records confirm that Victim 6 filed a lawsuit against PAPANTONIADIS.

the courthouse, Witness A told Victim 6 that he was there to help him, and he advised Victim 6 that the court could report Victim 6 to immigration authorities.  Attorney 1 approached Victim 6 and told him that PAPANTONIADIS did not want to pay him and that he should not talk to the judge.  Nevertheless, Victim 6 agreed to dismiss his lawsuit against PAPANTONIADIS and settle for a $400.00 payment.  Attorney 1 produced a signed, blank check.  Attorney 1 filled in the amount of $400.00 and had Victim 6 sign his name on a piece of paper. [34]  Victim 6 stated that after he accepted the check, he changed his telephone number and moved to another address.

*Victim 7*

23.    Victim 7 disclosed the following information regarding his experience at Stash's Pizzerias.[35]  The following is neither a verbatim transcript nor complete summary of all the information Victim 7 disclosed in connection with this investigation:

a.    Victim 7 worked for PAPANTONIADIS from in or around 2013, through on or about February 3, 2018.  Victim 7 began working at the Norwood location.   In 2014, he left Stash's Pizzerias but quickly returned.  Generally, he worked 6 days per week, from 10:30 a.m. to

---

[34] I have review bank records for PAPANTONIADIS-linked accounts during the relevant period.  These records do not include a check payable to Victim 6.  However, I have reviewed a handwritten note that was signed by Victim 6 and Attorney 1, which purports to relate to the dismissal of Victim 6's lawsuit.

[35] Victim 7 is a Salvadoran national.  In April 2013, he entered the United States illegally.  During this investigation, the Department of Homeland Security has helped Victim 7 obtain immigration benefits.  Specifically, HSI agents helped Victim 7 obtain "Continued Presence," which is a temporary immigration status for potential victims of human trafficking.  This status enables the recipient to remain in the United States, obtain employment, and become eligible to receive federal assistance benefits all for the duration of law enforcement's human trafficking investigation.

10:00 p.m., totally approximately 70 hours per week. He earned between $12.00 and $14.00 per hour and claims to have received overtime compensation.

  b.  PAPANTONIADIS did not permit employees to take breaks. The restaurants had video surveillance systems that PAPANTONIADIS used to monitor employees. Victim 7 found his job very stressful.

  c.  In 2016 or 2017, another Stash employee, who he identified by name, was arrested by immigration authorities and deported. Victim 7 believes this employee had just given notice of his intent to quit working at Stash's Pizzerias when he was arrested.

  d.  On or about February 1, 2018, Victim 7 contacted PAPANTONIADIS to ask for permission to take off the following Tuesday. On or about February 3, 2018, PAPANTONIADIS angrily confronted Victim 7 about his request for a day off. After an argument, Victim 7 left the restaurant intending to quit. However, as he drove away, he noticed PAPANTONIADIS following him. PAPANTONIADIS pulled his vehicle alongside Victim 7's car and appeared to be filming Victim 7 with his cell phone's camera. PAPANTONIADIS also made a gesture with his hands that looked like two wrists in handcuffs. PAPANTONIADIS's gesture scared Victim 7.

  e.  A few minutes later, police pulled over Victim 7. The police officer told Victim 7 that someone had reported that Victim 7 left the scene of an accident. Police inspected Victim 7's vehicle. The officer subsequently cited Victim 7 for leaving the scene of an accident with property damage and unlicensed operation of a motor vehicle.

  24.  I have reviewed a recording of PAPANTONIADIS's 9-1-1 call reporting Victim 7 and the Norwood Police Department report regarding this incident. During the 9-1-1 call, PAPANTONIADIS stated the following:

PAPANTONIADIS: Hi, I'm on Route 1 in Norwood.  Somebody just bumped me in the back.  When I asked for information, he said, "I don't have it," and took off.  He's driving a silver Maxima. And ah.

Dispatcher: What's the license plate?

PAPANTONIADIS:  It's ah, [Victim 7's license plate number]

Dispatcher:  Northbound or southbound?

PAPANTONIADIS:  Ah, I guess this is northbound.

Dispatcher: Headed to Walpole or Westwood?

PAPANTONIADIS:  Westwood.

Dispatcher:  So, Route 1 northbound, and he took off Route 1 northbound?

PAPANTONIADIS: Yeah.

Dispatcher: OK, can you come into the station?

PAPANTONIADIS: Ah, I gotta be at work at 11.  I mean, I can come later on.

Dispatcher: It's better if you can come in now and tell work you're gonna be a little late so we can take a report for you and at least try to get the other half this.  Alright?

PAPANTONIADIS: Yeah.

a.      According to a Norwood Police Department report, PAPANTONIADIS went to the Norwood police station and provided a statement.  He told an officer that he owned Stash's Pizza and Victim 7 was one of his employees.  PAPANTONIADIS also indicated that Victim 7 had come to Stash's Pizza to discuss having a day off.  PAPANTONIADIS said that Victim 7 "left unhappy."  PAPANTONIADIS reported that he left the restaurant in his truck and minutes later, Victim 7 hit PAPANTONIADIS from behind as he waited at an intersection. PAPANTONIADIS said he pursued Victim 7's vehicle, identified Victim 7 as the driver, wrote

down his license plate number, and yelled at Jane Doe 7 to pull over to exchange information, but Victim 7 yelled back that he did not have any information.

b.      Based on my review of the 9-1-1 call and my training and experience, PAPANTONIADIS's version of events is not credible.  First, according to PAPANTONIADIS's account, Victim 7 left first but still struck PAPANTONIADIS' vehicle from behind, which does not make sense.  Second, Victim 7's account is generally consistent with the statements of other victims and witnesses that I have interviewed.  Third, PAPANTONIADIS failed to disclose to the 9-1-1 dispatcher that he knew the driver of the vehicle that allegedly struck his truck.  In fact, he was reluctant to go to the police station to provide additional information, and only did so when the dispatcher pressed him to come in to make a full report.  Finally, PAPANTONIADIS's conduct is consistent with his practice of using and threatening to use law enforcement to exert pressure on undocumented employees.

*Witness B's Statements Corroborate the Undocumented Employees' Statements.*

25.      Witness B disclosed the following information regarding her experience at Stash's Pizzerias. [36]  The following is neither a verbatim transcript nor complete summary of all the information Witness B disclosed in connection with this investigation:

---

[36] In connection with her work at the Norwell location, Witness B was charged with the criminal offense of Larceny over $1,200.  This case is still pending.  During my interview of Witness B, she explained that PAPANTONIADIS directed her to void food order charges for certain customers.  She believes that the pending criminal charges stemmed from her personal falling out with PAPANTONIADIS.

Previously, Witness B was charged with (1) Accessory After the Fact to Larceny; (2) Operating a Vehicle After License Suspended; and (3) Assault and Battery.  None of these charges resulted in a conviction.  Because her statements are consistent with information provided by other victims and witnesses, I believe Witness B is reliable source of information.

a.      At all times relevant, Witness B was a United States citizen.  Witness B indicated that she began working at Stash's Pizzerias when she was 19 or 20 years old.  She continued working there on and off for ten years.  She worked at the following locations:  Norwell, Pacini's, Norwood, Dorchester, Roslindale, Randolph, and Onset.  She stopped working for PAPANTONIADIS in March 2019.

b.      Witness B worked in the front of the restaurant as a cashier, taking orders, and expediting food.  She also hired other employees to work in the front of the restaurant.  For these front-of-the-restaurant positions, PAPANTONIADIS only let Witness B hire young girls who spoke English.  PAPANTONIADIS hired the employees who worked in the back of the restaurant.  For these positions, he hired undocumented immigrants who were not on the books.

c.      PAPANTONIADIS paid the undocumented workers in cash.  They worked 7 days a week.  PAPANTONIADIS was aware of their immigration status and said that he would have the workers sent back to their respective countries.  The workers reported their hours to Witness B.  She would then send that information to PAPANTONIADIS via text message.

d.      During the time that Witness B worked at Stash's Pizzerias, she was addicted to heroin.  As a result, PAPANTONIADIS would call her a "crackhead" and say that "she would never be anything."  One day when she was working in the front of one of the restaurants, PAPANTONIADIS got angry with her and punched her in the chest in front of other employees.

e.      There were surveillance cameras at all the locations and PAPANTONIADIS would watch the cameras from his phone throughout the day.  If an employee took a cigarette break or took a phone call, PAPANTONIADIS would call to ask why the person was not working.

*Witness C's Statements Corroborate the Undocumented Employees' Statements.*

26.     Witness C disclosed the following information regarding her experience at Stash's Pizzerias.   The following is neither a verbatim transcript nor complete summary of all the information Witness C disclosed in connection with this investigation:

        a.     At all times relevant, Witness C was a United States citizen.  She worked for Stash's Pizzerias from Summer 2015 through January 2019.  She worked at the Dorchester and Roslindale locations.  She was a cashier and worked on the grill.  She was 20 years old when she started working at Stash's.

        b.     Witness C worked approximately 70 to 80 hours per week. PAPANTONIADIS knew Witness C needed the hours because she was supporting her drug-dependent parents.  PAPANTONIADIS fired Witness C a few times, including one time for using her cell phone to ask her partner to bring her inhaler to the restaurant.  During that episode, PAPANTONIADIS threatened to assault her.[37]

        c.     PAPANTONIADIS treated the undocumented employees very poorly, verbally abusing them and screaming at them.  He would make them work more than 12 hours per day, 7 days per week.  The undocumented employees would often complain to PAPANTONIADIS about not being paid for all of the hours they work.  In response, PAPANTONIADIS would say, "Tell them to go fuck themselves."

---

[37] Witness C reported PAPANTONIADIS's threat to Boston police.  In the report dated October 17, 2015, Witness C reported that the argument was about her request for a day off.  She also reported that PAPANTONIADIS said, "get it through your fucking head I have no problem catching a case over you!"

d.      The undocumented employees could not speak up for themselves.  When they tried to defend themselves, PAPANTONIADIS would either threaten them with violence or losing their jobs, which they needed.

## **REQUEST TO SEAL**

27.      I request that the Court seal this affidavit, the criminal complaint, and arrest warrant.  The information in this affidavit relates to an ongoing criminal investigation, aspects of which are not known to public.  Premature disclosure of this information could cause the target of the investigation to flee from prosecution, destroy evidence, and/or intimidate or tamper with witnesses and victims.

[The remainder of this page is blank.]

## <u>CONCLUSION</u>

28.     Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that, from in or around 2001 through in or around 2015, in Dorchester and elsewhere in the District of Massachusetts, Stavros PAPANTONIADIS, a/k/a "Steve Papantoniadis," did knowingly provide or obtain the labor or services of Victim 1 by means, or the combination of means, of force; threats of force; physical restraint; threats of physical restraint to Victim 1 or any other person; serious harm or threats of serious harm to Victim 1 or any other person; the abuse or threatened abuse of law or legal process; or by means of any scheme, plan, or pattern intended to cause Victim 1 to believe that, if Victim 1 did not perform such labor or services, Victim 1 or any other person would suffer serious harm or physical restraint, in violation of 18 U.S.C. § 1589(a).

Respectfully submitted,

Stacy Fleischmann
Special Agent
Homeland Security Investigations

**Mar 15, 2023**

Subscribed and sworn telephonically on March_____, 2023

HON. JUDITH G. DEIN
UNITED STATES MAGISTRATE JUDGE

34