UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>STAVROS PAPANTONIADIS )<br>) | )<br>)<br>) CRIMINAL No. 1:23-cr-10089<br>)<br>)<br> |

**DEFENDANT'S MOTION FOR A NEW TRIAL AND INCORPORATED MEMORANDUM OF LAW**

NOW COMES the Defendant, Stavros Papantoniadis, pursuant to Fed. R. Crim. P. 33 and respectfully requests that this Court order a new trial as the interest of justice requires. As grounds therefore, the Defendant asserts that the government failed to timely disclose discovery in violation of their discovery obligations pursuant to Fed. R. Crim. P. 16, Local Rules 116.1 and 116.2, *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Giglio*, 405 U.S. 150 (1972). The government's failure to timely disclose nearly 40,000 pages of material and relevant discovery until shortly before trial deprived the defendant of a fair trial and due process of law. Relatedly, the partial denial of the defendant's Motion to Continue Trial based on the untimely discovery productions was an abuse of discretion.

The Defendant requests that this Court defer ruling on this motion and permit the defendant to file a supplemental motion upon completion and review of the trial transcripts and thorough review of the nearly 40,000 pages of late produced discovery.

The Defendant further requests that this Court order the government to finally produce the entirety of his cell phone seized from his person during his arrest on March 16, 2023.

1

## PROCEDURAL AND FACTUAL BACKGROUND

**Complaint.** The Complaint, based on the affidavit of Department of Homeland Security, Homeland Security Investigations ("HSI") Special Agent Stacy Fleischmann ("SA Fleischmann"), charged the Defendant with one count of forced labor in violation of 18 U.S.C. § 1589(a) on March 15, 2023. An arrest warrant issued that same day. The Defendant was arrested on March 16, 2023 and appeared for his initial appearance. The Court (Dein, M.J.) ordered the government "to disclose all exculpatory information, in a timely manner, to the defendant." (Doc. 9).

**Indictment**. On March 29, 2023, an Indictment issued charging Papantoniadis in *Count 1* through *Count 4* with forced labor in violation of 18 U.S.C. § 1589(a), and in *Count 5* through *Count 7* with attempted forced labor in violation of 18 U.S.C. §§ 1589(a) and 1594(a).

**Arraignment.** On April 25, 2023, the defendant was arraigned and the Court (Dein, M.J.) issued an initial scheduling order. (Doc. 28). Pursuant to the scheduling order, the government was required to complete automatic discovery under Local Rule 116.1(c) and exculpatory evidence under Local Rule 116.2(b)(1) by May 2, 2023. (Doc. 28).

**Discovery Productions.** The government's production of discovery to defense counsel is described in detail in the *Affidavit of Counsel* (*Exhibit 1*). Below is a summary of the discovery production with further details incorporated into the arguments as they become relevant.

As a general matter, the discovery productions were not text searchable, organized in any manner such as folders, and there were no corresponding table of contents. *Exh. 1* at ¶6. Rather, each file was labeled by its beginning bates number. *Id.* The government simply produced an index for each production in the form of an excel spreadsheet that listed the beginning bates number, the end bates number, and the file path and file name of the document on the government's computer system. *Id.*

Between April 2023 and November 2023, the government disclosed 203,373 bates numbered pages of discovery – the equivalent of 80 to 100 bankers boxes. *Exh. 1* at ¶5. Those documents largely consisted of records subpoenaed from various banks, the Small Business Association, Equifax, Uphold, Rock City Pizza, Main Street Deli, Marriot, Uber, DoorDash, National Grid, Medaglia, Foodtec Solutions, DocuSign and various casinos. *Id.* at ¶5a. The documents also consisted of HSI reports of investigation ("ROI") disclosing interviews of approximately (57) witnesses and surveillance conducted by HSI. The witness interviews for alleged victims 1-7 and D-G had any and all identifying information redacted. *Id.* at ¶5b.

The cell phone seized from the defendant during his arrest was not produced to the defense because, according to the government, there was a video on the phone that the government opined was child pornography. The defense requested on several occasions that the government simply delete the video from any production to the defense. *Exh. 2*. The government refused relying on 18 U.S.C. § 3509(m). Thus, to review any data on the cell phone, the defense had to request times to view the cell phone at the United States Attorney's Office ("USAO"). Angelika Katsinis, a member of the defense team, viewed the alleged child pornography on the defendant's cell phone. *Exhibit 14* at ¶14 (*Affidavit of Angelika Katsinis*). In her opinion, the video was not of a child, but rather an older adult male who was bald. *Id.*

The government did not produce any discovery between December 2023 (when the May 2024 trial date was set) and April 22, 2024. Between April 22, 2024 and the start of evidence, the government produced 38,686 bates numbered pages of discovery (SP-00203372 through SP-00242060), additional documents without bates numbers, and two productions from the defendant's cell phone with thousands of texts, messages, and emails. *Exh. A.* at ¶¶13, 15, 17, 18, 20, 21, 24, 28, 30, 32, 34, 42.

**Motions in Limine.** The government filed motions in limine on April 24 and May 1, 4, and 6. The defense did not file any motions in limine or oppose the government motions in limine at that time because they were still reviewing discovery and were still being provided discovery.

**Defendant's Motion to Continue.** The defendant filed his first Motion to Continue Trial on May 8, 2024. (Doc. 95) and requested that the Court continue the trial four months – until September 30, 2024. At the time of filing, the government had produced approximately 6,875 pages of discovery since April 22, 2024. The government had produced another set of documents on May 4, 2024 which was received by Attorney Lepore on or about May 6, 2024. Attorney Lepore, at the time of filing the motion to continue, was not aware that the newest production consisted of 19,365 additional pages of discovery. *Exh. 1* at ¶21. The government opposed the motion to continue on May 8, 2024. (Doc. 99). The government conveniently omitted any reference to the newest disclosure, describing recent productions as "21-day discovery and early Jencks material." (Doc. 99 at 4).

On May 9, 2024, the defense filed a reply to the government's opposition notifying the court that the government produced an additional 19k pages of discovery. The defense further argued that while the defense was unable to review the most recent batch of discovery, it appeared that some of it was *Brady* and/or *Giglio* material. More specifically, the newly disclosed evidence included medical records, immigration documents, statements of the alleged victims and witnesses, DOL documents, photographs, and text messages. (Doc. 101 at 1).

The government filed a response to the defendant's reply on May 9, 2024. (Doc. 102). According to the government, they did disclose 25,952 pages of discovery on April 30 and May

4, 2024, but provided three excuses: (1) the Jencks material was an early production[1]; (2) the immigration files simply provide further detail on information already disclosed in the criminal complaint affidavit[2]; and (3) the defendant was a party to the DOL civil suit[3]. (Doc. 102 at 1).

On May 10, 2024, the Court granted in part and denied in part defendant's Motion to Continue Trial. Jury empanelment remained set for May 20, 2024 with evidence to begin on May 28, 2024. (Doc. 104).

**Trial.** The jury was empaneled on May 20, 2024. On May 28, 2024, the parties gave their opening statements, and the government called their first witness, Tharcisio Do Carmo (Victim 3) and second witness, William Passos (Victim 6). Trial continued on May 29, 2024 with the continued examination of Passos. The government called their third witness, Diya Ortega, and fourth witness, Julio Reyes Yanes (Victim 7). On May 30, 2024, the government continued their examination of Yanes, called their fifth witness Norwood Police officer Brandon Sweeney, and their sixth witness Mamdouh Elkashilan (Victim 1). Trial continued on May 31, 2024 with the continued examination of Elkashilan and the government called their seventh witness, Thiago Teixeira (Victim 5). On June 3, 2024, the government continued their examination of Teixeira and

---

[1] Pursuant to Local Rule 116.2, all Jencks material should have been produced by April 29, 2024. In any event, the productions on April 30, 2024 and May 4, 2024 were incomplete. *Exh.* __ ("Enclosed with this production are portions of certain victims' and witnesses' respective A-files…Please note that we are still awaiting additional immigration files from the Department of Homeland Security).

[2] The complaint affidavit from March 2023 disclosed only that the alleged victims received continued presence, and that HSI submitted certifications to enable Elkshilan (Victim 1) and Passos (Victim 6) to obtain T and U visas. (Doc. 4-1). At the time of trial, five of the alleged victims obtained their T visa and one was still pending. Moreover, the actual immigration files include exculpatory and impeachment information such as sworn statements of the alleged victims in support of their application, prior deportation proceedings, applications for derivative visas for family members, employment history, and cooperation with the government.

[3] The defendant was never provided, and had no knowledge of, memorialized witness statements during the pendency of the DOL civil suit. *Exh. 1* at 13a. The defendant was also not provided any of the internal emails of DOL investigators or communications with former employees.

called their eight witness, Silvia Bonilla (Victim 4). Trial continued on June 4, 2024 with the continued cross examination of Bonilla. The government called their ninth witness Jose Antonio Hernandez Navarette (Victim 2). On June 5, 2024, trial continued with the cross examination of Navarette and the government called their tenth and final witness, HSI Special Agent Evan Picariello. Thereafter, the government rested, and the Defendant moved for a directed verdict on all counts which was denied. On June 6, 2024, the defendant rested, and the parties gave their closing arguments. Following instructions, the jury began deliberations shortly after 12pm.

The jury returned their verdict on June 7, 2024. The jury acquitted the Defendant of *Count 1* (Mamdouh Elkashilan). The jury, however, convicted the Defendant of *Count 2* (Jose Antonio Hernandez Navarette); *Count 3* (Tharcisio Ribeiro Do Carmo); *Count 4* (Silvia Bonilla Vilorio); *Count 5* (Thiago Silva Teixeira); *Count 6* (William Dos Passos); and *Count 7* (Julio Cesar Yanes Reyes).

## RELEVANT LEGAL PRINCIPLES

**I. The Legal Standard Governing Motion for a New Trial Under Rule 33**

This Court has broad discretion to vacate any judgment and grant a new trial for any reason if the interest of justice so requires. Fed. R. Crim. P. 33(a). See also *United States v. Baptiste*, 8 F.4th 30, 40-21 (2021). The authority to grant a motion for a new trial is much broader than the Court's power to grant a motion for a judgment of acquittal and the Court "need not view the evidence in the light most favorable to the verdict." *United States v. Alston,* 974 F.2d 1206, 1210 (9th Cir. 1992). The decision to grant a new trial is left to this Court's sound discretion. *United States v. Soto-Alvarez*, 958 F.2d 473, 479 (1st Cir. 1992).

**II. The Prosecutor's Discovery Obligations**

Turning over exculpatory materials is a core responsibility of all prosecutors whose

professional interest and obligation "in a criminal prosecution is not that it shall win a case, but that justice is done." *Berger v. United States*, 295 U.S. 78, 88 (1935). To level the playing field, prosecutors must <u>timely</u> satisfy its discovery and evidentiary obligations, as required by Fed. R. Crim. P. 16, Local Rules 116.1 and 116.2, *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972); *Kyles v. Whitley*, 514 U.S. 419 (1995), and the Fifth, Sixth and Fourteenth Amendments to the U.S. Constitution.

### A. Rule 16

In relevant part, Fed. R. Crim. P. 16(a)(1)(B) requires the government to disclose any relevant written or recorded statement by the defendant if the statement is within the government's possession, custody, or control; and the government knows that the statement exists.

Fed. R. Crim. P. 16(a)(1)(E) requires the government to produce:

> books, papers, documents, data, photographs, tangible objects, buildings or places, or copies or portions of any of these items, if the item is within the government's possession, custody, or control and:
>
> (i)      the item is material to preparing the defense;
>
> (ii)      the government intends to use the item in its case-in-chief at trial; or
>
> (iii)      the item was obtained from or belongs to the defendant.

Evidence is material to the preparation of a defense within Rule 16 if "it could be used to counter the government's case or to bolster a defense," *United States v. Reddy*, 190 F. Supp. 2d 558, 572 (S.D.N.Y. 2002), whether or not the prosecution intends to offer the evidence at trial, *United States v. Stevens*, 985 F.2d 1175, 1180 (2d Cir. 1993). The Rule "is not limited to evidence that is favorable or helpful to the defense and does not immunize inculpatory evidence from disclosure. Inculpatory evidence, after all, is just as likely to assist in the preparation of the defendant's defense' as exculpatory evidence" and "is just as important to the preparation of a

defense to know its potential pitfalls as to know its strengths." *United States v. Safavian*, 233 F.R.D. 12, 15 (D.D.C. 2005), quoting from *United States v. Marshall,* 132 F.3d 63, 67 (D.C. Cir. 1998).

### B. Local Rules 116.1 and 116.2

The United States District Court for the District of Massachusetts Local Rules require prosecutors to disclose Rule 16 materials and exculpatory information within 28 days of arraignment. See Local Rule 116.1(a) and (c)(1), and 116.2(a) and (b)(1).

Local Rule 116.2(b)(2) requires that the prosecutors disclose Jencks material no later than 21 days before the trial date.

### C. *Brady* and *Giglio*

The Supreme Court held in *Brady* that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. Favorable evidence includes not only exculpatory information but also "impeachment evidence that is relevant either to guilt or punishment." *United States v. Tsarnaev*, 968 F.3d 24, 73-74 (1st Cir. 2020), citing *United States v. Bagley*, 473 U.S. 667, 674-76 (1985), and *Giglio*, 405 U.S. at 154.

The government's disclosure obligation extends to evidence used to impeach the credibility of a government witness. *Giglio,* 405 U.S. at 154. Impeachment evidence is important because "if disclosed and used effectively, it may make the difference between conviction and acquittal." *Bagley,* 473 U.S. at 676. That is, a jury's "estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence" *Napue v. Illinois,* 360 U.S. 264, 269 (1959) and "the effective impeachment of one eyewitness can call for a new trial even though

the attack does not extend directly to others[.]" *Kyles,* 514 U.S. at 445, citing *United States v. Agurs,* 427 U.S. 97, 112-13 n. 21 (1976).

With respect to materiality, "[t]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Strickler v. Greene*, 527 U.S. 263, 264 (1999), quoting *Kyles*, 514 U.S. at 434. See also *United States v. Cunan,* 152 F.3d 29, 34 (1st Cir. 1998) (explaining a petitioner may be entitled to a new trial under *Brady* without convincing the court of the certainty of a different outcome). The question of materiality is considered "collectively, not item by item." *Kyles*, 514 U.S. at 436.

The government's disclosure obligations are both substantive and temporal. *United States v. De La Cruz-Feliciano*, 786 F.3d 78, 87 (1st Cir. 2015) ("*Brady* also applied in cases where the Government delays disclosure of relevant evidence"). See also *United States v. Sepulveda*, 15 F.3d 1161, 1178 (1st Cir. 1993). Due process requires that if the government has delayed disclosure, "the defendant further must show 'that the delay prevented defense counsel from using the disclosed material effectively in preparing and presenting the defendant's case.'" *Id.,* quoting *United States v. Van Anh*, 523 F.3d 43, 51 (1st Cir. 2008). It is enough for the defendant to "make a 'prima facie' showing of a plausible strategic option which the delay foreclosed." *Van Anh*, 523 F.3d at 51. Simply put, the defendant has the right to fully confront and evaluate the evidence that will be used against him in a timely fashion.

**ARGUMENT**

**I.    THE GOVERNMENT'S UNTIMELY DISCLOSURE OF EXCULPATORY EVIDENCE IN THEIR POSSESSION PREJUDICED THE DEFENDANT.**

The government's case rose and fell on the credibility of the 7 alleged victims. As the government put it, "this case is largely one based on victim and witness testimony." (Doc. 99 at

9

1). As discussed below, the untimely produced documents are exculpatory as the defendant could have used various portions of the records to undermine the credibility of key facets of the government's case. Moreover, the untimely disclosures prevented defense counsel from learning the facts necessary to seek exclusion of prejudicial evidence until it was too late.

Given the 14-day time constraint imposed by Fed. R. Crim. P. 33, if permitted to supplement, the defendant anticipates additional arguments[4] once the trial transcripts are complete[5] and he can thoroughly review the entirety of the voluminous discovery to further substantiate his claims of prejudice. *Exh. 1* at ¶41.

### A. The DOL Statements and Internal Emails.

To be clear, the defendant was never provided any personal statements of employees during the pendency of the DOL investigation or civil suit, nor internal emails between investigators discussing contacts with employees. *Exh. 1* at ¶13a. The majority of these statements were produced on May 17, 2024.[6]

Had these statements been disclosed in a timely fashion, the defense would have had more time to investigate and utilize the documents in a more effective manner. In particular, the defendant could have utilized the *Brady* material to present and substantiate the theory that the

---

[4] Some of the contemplated additional issues require a review of the testimony at trial and a thorough review of the untimely disclosed discovery. Those issues include but are not limited to the disclosure of evidence pertaining to the deportation of former employee, Ruben Gomez; the claims about fair pay and not being paid for all hours and whether the payroll records support those claims; the suppressed photograph of Navarette (Victim 2) introduced as exhibit 41 at trial and undisclosed text messages with the defendant listed as government exhibit 42; and additional DOL statements that were untimely disclosed.

[5] The transcripts were ordered on June 10, 2024.

[6] The defense received 19,365 pages of discovery on May 6, 2024 which included documents from the DOL. *Exh. 1* at ¶21. The defense notified the government on May 9, 2024 that we could not access the .pdf files on the disk and requested that they provide the discovery through USAfx. *Id.* The government did not respond and waited until May 17, 2024 to reproduce the files knowing that we were unable to access them. *Id.*

alleged victims had colluded and formulated a scam to obtain immigration benefits by making false claims against the defendant.

More specifically, there is an email dated February 6, 2018 in which DOL Investigator Heather Burton ("Burton") requests the "U visa script" in Spanish. *Exh. 15*. Based on the facts disclosed in the email, this request is in reference to Julio Cesar Yanes Reyes (Victim 7). Burton also inquires whether the "DOJ list" can be shared directly with the employee. *Id.* As far as defense counsel is aware, this is the only evidence in any of the discovery disclosing the point at which an alleged victim is told about T and U visas and potentially provided legal counsel.

The next morning, Carmo (Victim 3) contacted Burton, (*Exh. 16*) and provided a statement on February 12, 2018. *Exh. 17* (DOL statement 2/12/18). Notably, Carmo also states that he "heard about what he did to Julio" and "If you can guarantee I won't get deported. I have a wife and a baby coming. I will go to court for you if you can guarantee I won't get deported." *Id.*

On February 14, 2018, Bonila (Victim 4) contacted DOL to supposedly provide an updated address. *Exh. 18* (DOL statement 2/14/18). She had not spoken to the DOL since August of 2016. In her 2016 statements, she makes no mention of any fear, ill treatment, threats, and certainly nothing about witnessing any assault on Teixeira (Victim 5). *Exh. 19* (DOL statements 5/24/16 and 8/8/16).

These three alleged victims were all coworkers and were connected via Facebook. Had this information been timely disclosed, the defense would have been able to effectively make use of it and argue in closing that the timing is not a coincidence – that these individuals exchanged information and schemed to obtain immigration benefits. This alone satisfies the defendant's "'prima facie' showing of a plausible strategic option which the delay foreclosed." *Van Anh*, 523 F.3d at 51

### B. The Immigration Documents

From the very beginning of this case, the government has known that the defense viewed the immigration benefits conferred on the alleged victims as highly relevant to a motive to fabricate and grounds to impeach their credibility. (Doc. 20). Prior to the April 30, 2024 disclosure letter (*Exh. 7)*, however, the defense was unaware about what benefits they received beyond continued presence status and had none of the information contained within the immigration files. That information included exculpatory and impeachment information such as sworn statements of the alleged victims in support of their application, prior deportation proceedings, applications for derivative visas for family members, employment history, and cooperation with the government. As part of early Jencks, the government produced a portion of the immigration files for Victims 2, 4, and 7. *Exh. 1* at ¶17b. On May 7, 2024, the defense requested, in relevant part:

> Any and all benefits and applications for benefits provided to each alleged victim or witness through any government agency, including but not limited to USAO, ICE, HSI, and Department of Health and Human Services;
>
> Complete immigration files for each alleged victim and witness, including but not limited to forms I-131, I-192, I-765, I-912, I-914, and I-918;
>
> Complete benefit and services packet for each alleged victim and witness;
>
> *Exh. 1* at ¶22d, g, and h.

While the defense received a production of 19,365 pages of discovery on May 6, 2024 that included portions of immigration files for Victims 1-7. *Exh. 1* at ¶21. The defense notified the government on May 9, 2024 that we could not access the .pdf files on the disk and requested that they provide the discovery through USAfx. *Id.; Exh. 4*. The government did not respond and waited until May 17, 2024 to reproduce the files knowing that we were unable to access them. *Exh. 1* at ¶¶21, 32.

On May 16, 2024, the government produced the complete immigration file for Mahmoud

12

Elkashilan (Victim 1). *Exh. 1* at ¶30. Between May 22 and 23, 2024, the government produced another 2,281 pages of discovery which included complete copies of immigration files for Victims 3, 4, and 7; and Fernando Nagime who did not testify at trial. *Id.* at ¶34b, c, e, and f.

### i. Tharcisio Do Carmo (Victim 3)

The government notified defense counsel via email on May 23, 2024 that they would be calling Carmo as their first witness. Thereafter, the defense received the immigration file for Carmo (Victim 3). *Exh. 1* at ¶34(c). The certification of documents form provided by the Department of Homeland Security, however, is dated May 2, 2024. *Exh. 20.* That is, the government had these documents for 21 days before disclosing them to the defendant and after jury empanelment.

Without sufficient time to review and understand these records, and trying to review the other thousands of pages of late produced discovery, the defense did not utilize them in an effective manner. While Carmo admitted at trial that getting a visa was very important to him, the records contained additional information such as his desire to receive additional restitution, his desperation not to return to Brazil, and that his wife also applied for a derivative visa through his cooperation in this case.

### ii. Silvia Bonilla (Victim 4)

The defense received the immigration file for Bonilla (Victim 4) on May 23, 2024. *Exh. 1* at 34(c). The certification of documents form provided by the Department of Homeland Security, however, is dated May 2, 2024. *Exh. 21.* That is, the government had these documents for 21 days before disclosing them to the defendant after the jury was already empaneled.

Through the declaration of Bonilla (Victim 4) submitted in support of her T visa application, the defense learned for the first time that when Bonilla was 12 years old, she witnessed

13

her father being shot multiple times in the street after he saved her sister from a would-be kidnapper. According to her declaration, when she witnessed the incident between Teixeira (Victim 5) and the defendant "all the memories of my dad getting killed came flooding back. I was so afraid. I found myself crying and shaking profusely." (*Exh. 22* at 5, ¶45). Bonilla testified at trial consistent with these statements.

The intent element of forced labor requires that the defendant knew, or reasonably should have known, about the victim's background and circumstances to include special vulnerabilities. *United States v. Bradley,* 390 F.3d 145, 152-153 (1st Cir. 2004), *judgment vacated on other grounds*, 390 F.3d 145 (2005). The defendant did not know that the government would illicit this testimony as it was irrelevant absent some showing that the defendant knew about Bonilla's special vulnerability. Surely, Bonilla did not mention this fact in any of her witness statements or Grand Jury testimony.

**C. The Defendant's Cell Phone Seized on March 16, 2023.**

The government used the Adam Walsh Act, 18 U.S.C. § 3509 as a shield to inhibit the defendant's access to and unrestricted review of his cell phone seized during his arrest on March 16, 2023. Regardless of the video in which the defense disputes is contraband, the messages should have been disclosed pursuant to Fed. R. Crim. P. 16(a)(1)(B) as they are written or recorded statements made by the defendant.

The government will likely argue, as they did in their opposition to the defendant's Motion to Continue Trial, that they made extensive efforts to facilitate counsel and defendant's personal review of the data on the defendant's cell phone. That is not the issue. The issue is that when it came time to produce the relevant materials for use at trial, the government either refused or provided insufficient disclosures. In regard to the photographs and videos, at the request of the

government, the defense provide the government with a specific list of files designated by dates and times. *Exh. 1* at ¶23; *Exh. 2; Exh. 14* at ¶¶9, 10. The government later claimed the list was too vague. *Exh. 1* at ¶23; *Exh. 14* at ¶10.

As for the text messages, there were text messages on the phone viewed by the defense in-person that could not be located on the productions by the government. *Exh. 14* at ¶17. Moreover, the productions of text messages did not include any attachments, photographs, or videos. *Exh. 1* at ¶19, 24. As for the photographs and videos, it appears the government had no issue extracting items off the phone for their use at trial. Specifically, it appears from the government's trial exhibits 76-82 that the government used Magnet Forensics to process and scan the phone on March 24, 2023 at 3:05:17PM and produced reports with photographs with metadata on May 21, 2024. *Exh. 23*.

The failure to produce the materials the defense deemed exculpatory and relevant for use at trial was in violation of their discovery obligations and deprived the defendant his right to access and use the evidence in the possession of the government. The defendant respectfully requests that this Court order the government to finally disclose the entirety of the defendant's cell phone. While the Court could view the alleged contraband *in camera* and decide for itself, the video could just be removed from the defendant's production.

II.   **THE CUMULATIVE EFFECT OF THE DISCOVERY VIOLATIONS UNDERMINES CONFIDENCE IN THE VERDICT.**

The government made a willful attempt to gain a tactical advantage at trial – and it worked. The government should have and could have disclosed the discovery as required to ensure a fair trial. Instead, while the government was preparing for trial, the defense was still reviewing discovery. The defense should have been provided the discovery with sufficient time to review and prepare for trial, draft and oppose motions in limine, propose jury instructions and voir dire;

prepare for cross-examinations; prepare a defense case and witnesses; organize trial materials for the effective use at trial; and consult with the defendant.

In considering the untimely disclosed materials, this Court should also consider the numerous issues caused by redactions of all identifying information that would allow counsel to accurately discern and evaluate the witness statements. These redactions disadvantaged the defense and their investigators from learning information, locating witnesses, and investigating the claims made by the alleged victims and dozens and dozens of witnesses.

The government also mislabeled redacted documents as belonging to other witnesses. If it were not for defense counsel's continued inquiries, the defense would not have learned on May 21, 2024 that the Grand Jury minutes and ROI labeled "Victim 2" was actually the testimony and ROI of Victim 2's brother who was not a trial witness. *Exh. 1* at ¶34(a)(iv); *Exh. 24*. In another instance, on May 27, 2024, the government notified defense counsel that the DOL statements attributed to Victim 3 were actually the statements of Victim 5. *Exh. 1* at ¶40.

Due to the protective order in this case and redactions of identifying information, the defendant's review of the materials was frustrated. The protective order was amended in January 2024 and the government provided Wyatt Detention Facility with a USB drive containing redacted interviews in or about February or March 2024. *Exh. 1* at ¶7. The Defendant's ability to review that material – and thus ability to aid his counsel in his defense – was limited to 1 hour and 35 minutes per week. *Id.* at ¶8. In any event, the government did not provide any of the discovery produced in April and May 2024 to Wyatt Detention Facility. *Id.* at ¶13b.

While true that these alleged victims and witnesses worked for the defendant, the allegations span over a decade and the defendant employed hundreds of employees. Even so, the defense only learned the true names of alleged victims and witnesses on April 30, 2024 – names

that were not the names alleged victims and witnesses used while employed by the defendant. *Exh. 7* at 2.

The government's untimely disclosure of discovery including but not limited to trial witness statements, immigration files, evidence seized during the various searches pursuant to search warrants, surveillance photographs, DOL emails, undercover agent recordings, agent notes, information pertaining to the deported employee "Ruben", was in violation of their discovery obligations and, when considered collectively, is sufficient to undermine confidence in the trial verdict. See *Kyles*, 514 U.S. at 434.

### III. THE COURT ABUSED ITS DISCRETION IN DENYING THE DEFENDANT A CONTINUANCE BEYOND ONE WEEK.

Trial management, including the decision to grant or deny a request for a continuance, is distinctly within the Court's purview. *See United States v. Saccoccia,* 58 F.3d 754, 770 (1st Cir. 1995) (stating that a district court has "broad discretion to grant or withhold continuances."). In determining whether to grant or deny a continuance, the Court considers factors such as the reasons presented in support of the request, the amount of time actually available for trial preparation, how assiduously the movant used that time, the extent to which the movant has contributed to his need for additional time, the extent of inconvenience to others, and the likelihood of injustice or unfair prejudice attributable to a denial of a continuance. *United States v. Rodriguez–Duran,* 507 F.3d 749, 763 (1st Cir. 2007); *United States v. Orlando–Figueroa,* 229 F.3d 33, 40 (1st Cir. 2000). The Court's discretion to grant or deny continuances, however, is "limited by the defendant['s] constitutional rights to effective assistance of counsel and to the testimony of defense witnesses." *Orlando–Figueroa,* 229 F.3d at 39–40.

An abuse of discretion occurs if "the court exhibited an 'unreasonable and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay.'" *Rodriguez–*

*Duran,* 507 F.3d. at 763, quoting *Rodriguez–Marrero,* 390 F.3d at 21–22. "Identifying prejudice from the ruling is essential." *Id.*, citing *Saccoccia,* 58 F.3d at 770.

The defendant's motion to continue was justified by the government's untimely disclosure of 25,952 pages of material discovery less than a month before trial, on top of the more than 200,000 pages of discovery already produced. See and compare *Rodríguez–Durán,* 507 F.3d at 767 (denial of continuance no abuse when counsel had about a month to review approximately 1000 pages of documents); and *United States* v. *Williams*, 630 F.3d 44, 48 (1st Cir. 2010) (denial of continuance no abuse when counsel had 4 weeks to review 700 pages of documents and hours of recorded telephone calls). The necessity of a continuance was through no fault of the defendant or any lack of diligence on the part of his attorneys. In fact, on April 19, 2024, defense counsel notified the government they would not be seeking a continuance and only thereafter did the government bury the defendant in additional discovery. *Exh. 1* at ¶¶10, 11, 13, 15, 17-22, 24, 30, 34.

The Court was also misled by the government in their representations to this Court about the contents of the late produced discovery. (Docs. 99 and 102). Having just received the discovery, defense counsel was unable to challenge their assertions. Further compounding the lack of candor with the defense and this Court, the government opposed the motion knowing they were still sitting on another 13k pages of discovery[7] and insisting that trial proceed as scheduled because they had been preparing for "months" (Doc. 99 at 7).

---

[7] After the status hearing on May 10, 2024, the government produced approximately 13,382 pages of additional discovery and portions of the defendant's cell phone in various productions through May 26, 2024 – two (2) days before the start of evidence. *Exh. 1* at ¶¶ 28, 30, 32, 34.

18

## CONCLUSION

For the foregoing reasons, Mr. Papantoniadis respectfully requests that this Court:

A. Defer ruling on this motion to allow time for the completion of transcripts and discovery review;

B. Allow the defendant to file a supplement to this motion for a new trial;

C. Order the government to produce the defendant's cell phone;

D. Ultimately vacate the defendant's convictions and order a new trial; and,

E. Grant such other relief as is just and proper.

Respectfully Submitted
Stavros Papantoniadis,
By his attorney,

/s/ Ashley P. Allen
Ashley P. Allen
7 Elm Steet, Suite 348
Boxford, MA 01921
(617) 925-7888
BBO # 697825

June 21, 2024

## CERTIFICATE OF SERVICE

I, Ashley Allen, attorney for the Defendant, certify that this document filed through the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Ashley P. Allen
Ashley P. Allen