UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>STAVROS PAPANTONIADIS<br><br>Defendant | CRIMINAL No. 23-cr-10089-FDS |

### SENTENCING MEMORANDUM OF THE UNITED STATES

On June 7, 2024, a jury convicted defendant Stavros Papantoniadis of six counts of a seven-count Indictment: three counts of Forced Labor and three counts of Attempted Force Labor, in violation of 18 U.S.C. §§ 1589(a) and 1594(a). The government respectfully requests that the Court impose a sentence of 121 months' imprisonment, to be followed by 3 years of supervised release, a fine of $35,000, restitution, and a mandatory special assessment of $600.

Papantoniadis ran an operation designed to force victims to work against their will. He did so through brute force, threats of violence, and threats of deportation. These methods enabled Papantoniadis to use fewer workers and exercise a level of control over his workers that no law-abiding employer could ever obtain. As a result of his criminal conduct, his businesses were successful. At the same time, the victims lived in fear, working when they did not want to and living ever mindful of the physical and legal consequences the defendant could impose. That fear fueled the defendant's operation. And regardless of whether Papantoniadis was motivated by greed or cruelty, the effect was the same: The victims suffered physically and emotionally, and they continue to feel the painful effects of his conduct. To account for this human suffering, the Court must impose a substantial term of imprisonment.

**Background**

Papantoniadis ran his network of pizzerias as a forced labor operation. PSR ¶ 9. He recruited and targeted undocumented, foreign national employees to staff his restaurants, particularly the "back of the house" positions, such as line cooks, prep cooks, pizza makers, and cleaners. Once employed, Papantoniadis subjected the workers to violence, threats of violence, and exploitation of their immigrant status. PSR ¶ 9. This scheme enabled him to operate his businesses with fewer workers, whom he paid less, and over whom he exercised a degree of control that no law-abiding employer could ever obtain. PSR ¶ 10. As a result, Papantoniadis obtained a substantial financial benefit and advantage over law-abiding competitors and profited thereby. PSR ¶ 10.

The defendant forced or attempted to force at least six people to work up to fourteen hours per day for him, often seven days a week. *See* PSR ¶¶ 15, 26, 40, 48, 56. He kept the victims, who lacked immigration status and work authorization, in service against their will by threatening to report them to immigration authorities and/or using violence to intimidate them. *See* PSR ¶ 9. The defendant monitored his staff through an extensive network of surveillance cameras, *see* PSR ¶ 28, and frequently demeaned and harassed them, including instances of sexual harassment, *see* PSR ¶ 16, 20, 59. Workers could not take breaks. *See* PSR ¶ 49. One victim worked such long hours that he could only wash his Stash's Pizza uniforms by wearing them in the shower. *See* PSR ¶ 26. Another forewent medical treatment when the defendant insisted that he work, and so he performed the procedure on himself instead. *See* PSR ¶¶ 18–19.

He kept his victims in his service by threatening them with deportation. *See* PSR ¶ 9, 14, 35, 45, 57–58, 62, 66. Threats of violence and other reprisals further helped him to keep his victims working for him. The victims watched him throw one employee against a door so hard that he fell

2

out of the pizza shop. *See* PSR ¶ 13. When Victim 5, Thiago Teixeira, asked the defendant to respect his decision to leave Stash's Pizza, the defendant, a 290-pound man, violently choked him until Teixeira was able to flee. *See* PSR ¶¶ 50–51, 157. Papantoniadis threatened to harm another employee, boasting that he "had killed" a person and had broken somebody's teeth. *See* PSR ¶ 60. When Victim 7, Julio Yanes Reyes, tried to leave and drive away from a pizza shop, the defendant chased him in his car, filed a false police report, and drove past his apartment multiple times, all to pressure the victim back into his service. *See* PSR ¶ 69–74.

## Guideline Analysis and Criminal History

I. <u>Counts 3, 4, and 7 have an adjusted offense level of 25</u>.

The government concurs with Probation's analysis in the PSR, with a small exception that does not affect the total offense level. Each victim forms a single group for the Guidelines. The base offense level for each group is 22, pursuant to USSG § 2H4.1(a)(1). PSR ¶¶ 79, 86, 92, 98, 105, and 112. A specific offense characteristic applies for the length of the forced labor: three levels pursuant to USSG § 2H4.1(b)(3)(A) for Victims Two, Three, Four, Six and Seven; and two levels pursuant to USSG § 2H4.1(b)(3)(B) for Victim Five (Thiago Teixeira). PSR ¶¶ 81, 87, 93, 99, 106, 113. Accordingly, the adjusted offense level for Count Three/Victim Three (Tharcisio Do Carmo), Count Four/Victim Four (Sylvia Bonilla), and Count Seven/Victim Seven (Julio Cesar Yanes Reyes) is 25.

II. <u>Count 2 has an adjusted level of 27</u>.

With regard to Count Two/Victim Two (Jose Antonio Hernandez Navarette), the government requests application of the specific offense characteristic § 2H4.1(b)(1)(B), because the victim sustained a serious bodily injury. Pursuant to § 1B1.1, comment. n. 1(M), a serious bodily injury is an "injury . . . requiring medical intervention such as surgery, hospitalization, or

physical rehabilitation." As a result of the working conditions, which the defendant forced the victim to endure, he suffered ingrown toenails which required surgery. *See* PSR ¶ 18; Trial Ex. 40. Accordingly, the adjusted offense level for Count Two/Victim Two (Jose Antonio Hernandez Navarette) is 27.

    III.    <u>Counts 5 and 6 have adjusted offense levels of 26 and 27, respectively</u>.

With regard to Count Five/Victim Five (Thiago Teixeira) and Count Six/Victim Six (William Dos Passos), an additional two-level adjustment applies because the defendant committed another felony offense during commission of attempted forced labor, pursuant to USSG § 2H4.1(b)(4)(A).

First, on August 20, 2013, the defendant attacked Victim Five (Thiago Texeira), grabbing hm around the neck, ripping his shirt and leaving marks on his neck and wrist. PSR ¶ 51; Trial Exs. 50–53. This was assault and battery, in violation of M.G.L. c. 265, § 13A(a), which is punishable by not more than 2.5 years in the house of corrections (a felony under federal law); and strangulation, in violation of M.G.L. c. 265, § 15D, which is punishable by not more than five years in prison and 2.5 years in the house of corrections.

Second, in May 2015, the defendant threw pans at Victim Six (William Passos). PSR ¶ 61. This was assault with a dangerous weapon, in violation of M.G.L. c. 265, § 15(b), which is punishable by not more than five years in prison and 2.5 years in the house of corrections. Accordingly, Count Five/Victim Five (Thiago Texeira) is adjusted offense level 26 and Count Six/Victim Six (William Passos) is adjusted offense level 27.

    IV.    <u>The total offense level is 32</u>.

Under the grouping analysis, the highest adjusted offense level is 27 (Count Two/Jose Antonio Navarette and Count Six/William Passos). The remaining four counts are all equally

serious or from one to four level less serious. As a result, there are six units, which adds five levels to the highest offense level pursuant to USSG § 3D1.4. PSR ¶¶ 118-120. Papantoniadis' combined adjusted offense level is 32. PSR ¶ 121. The defendant receives no adjustment for acceptance of responsibility. Therefore, the total offense level 32. PSR ¶¶ 123-124.

    V.    <u>The advisory guideline range is 121 to 151 months in prison and a fine of $35,000 to $350,000</u>.

Papantoniadis has no scoreable criminal convictions. However, he does have a criminal record. Most notably, Papantoniadis was convicted of homicide by negligent operation of a motor vehicle and leaving the scene of an accident with personal injury and death. For this offense, he served a year in the house of correction with the remainder of his sentence suspended. While this conviction did not score, it still played a role in the defendant's offenses: he used his conviction as part of his threats against his workers. *See* Trial Tr. 2–140 and 3–82 (Passos testifying that the defendant bragged about killing someone).

With a total offense level 32, and criminal history category I, the applicable advisory sentencing guidelines range is 121 to 151 months' imprisonment and a fine of $35,000 to $350,000.

**Argument**

    I.    <u>The sentencing factors under 18 U.S.C. § 3553(a) support a sentence of ten years.</u>

For years, Papantoniadis abused and exploited other human beings. The statutory factors the Court must consider when selecting a fair and just sentence support the imposition of a 121-month term of imprisonment.

    A.    <u>The nature and circumstances of the offense and history and characteristics of the defendant support the recommendation.</u>

The Court should impose the term of imprisonment the government recommends because Papantoniadis' offense caused tangible and enduring harm, and aspects of his offense reveal a

5

depravity that warrants an appropriately long sentence.

Papantoniadis' successful businesses were built on the victims' fear and despair. At trial, each victim testified that they came to this country eager for the opportunity to work hard and make a new life for themselves. Papantoniadis exploited the victim's industrious spirit and pushed each victim beyond his or her limit. And when the victims wanted to leave, that was when the pain got worse. The ensuing violence and threats had a lasting impact on each victim. The fear kept them at Stash's Pizza. However, it is the fear and the resulting emotional scars that many carry with them years after leaving the defendant's operation. *See, e.g.*, Trial Tr. 4–28 (Reyes Yanes indicating that he continues to be fearful of the defendant, testifying, "Yeah, ever since that I was afraid, and I ended up being alert for myself all the time."); Trial Tr. 6–108, 6–113, 6–115 (Bonilla testifying that after seeing the defendant attack Teixeira, she was afraid of the defendant). The sentence in this case must account for both harms: the labor that was forced through violence and fear; and the lasting impact of those experiences.

In fashioning a sentence, the Court should also consider what Papantoniadis' conduct reveals about his state of mind. As the Court observed at trial, for years the defendant harmed, threatened and pressured victims. He used a video surveillance system, and the victims knew he would monitor them even when he was not present. He told them he had killed someone to prevent them from questioning the sincerity of his threats of violence. Trial Tr. 2–140 and 3–82 (Passos testifying that the defendant bragged about killing someone). He did all this to people who were just trying to make money to feed themselves and their families. In fact, as reflected in the PSR, the defendant's conduct is consistent with his track-record of harming others and causing pain going back decades. PSR ¶¶ 129–30. This defendant's profound lack of empathy—which has been on display for years—further supports a ten-year sentence.

Moreover, while the harmful effects of the defendant's conduct should be the primary focus, the Court should also consider why the defendant engaged in this specific criminal conduct. On one hand, to some extent, Papantoniadis' conduct was certainly motivated by greed. He ran a network of pizza businesses. Extra labor from fewer workers meant more profit. More profit meant more cash to support his lifestyle, including hundreds of thousands of dollars in gambling losses. *See* PSR ¶ 161 and Tr. Ex. 90–91 (Mohegan Sun and Encore Boston Harbor records reflecting hundreds of thousands of dollars in gambling losses).

On the other hand, greed and a mere indifference to the plight of others does not fully account for the defendant's conduct. It does not explain his penchant for vile, racist and anti-immigrant slurs. *See, e.g.,* Trial Tr. 2–70 (Carmo testifying that the defendant called the Brazilian workers "monkeys"); *see, e.g.*, Trial Tr. 6–31 (Teixeira testifying that after the defendant attacked him, he yelled "Stupid immigrant, you're a stupid immigrant."). It does not explain the homophobic taunts. *See* Trial Tr. 2-78 (Carmo testifying that the defendant told Hernandez Navarette, "You're going to leave because you are not a man, you're a faggot."); Trial Tr. 2-158 (Passos testifying that the defendant told him, "I know you hanging out with another faggot over there from Norwood"); Trial Tr. 2–159 (Passos describing how the defendant asked him to drink his semen out of cup). Nor does greed fully explain the defendant's rageful violence targeting Thiago Teixeira. *See, e.g.*, Trial Tr. 2–65 (Carmo testifying that when the defendant attacked Teixeira, he said "Come here, Motherfucker, I'll break you."); *see, e.g.*, Trial Tr. 2–69 (Carmo describing Bonilla's reaction to the defendant's attack on Teixeira, "she was crying and shaking pretty bad because she was really scared, too."). Sadism is the only logical explanation for some of this conduct. The defendant enjoyed controlling the victims. He enjoyed making them afraid. He enjoyed causing them pain. The Court's sentence must account for this characteristic of the

7

defendant and aspect his years of conduct in case.

### B. The recommended sentence is necessary to deter others.

A ten-year sentence will adequately deter others who engage in forced labor. 18 U.S.C. § 3553(a)(2)(B). In October 2000, Congress directed the Sentencing Commission to "take all appropriate measures to ensure that these sentencing guidelines and policy statements applicable to [18 U.S.C. § 1589(a), *inter alia*,] are sufficiently stringent to deter and adequately reflect the heinous nature of such offenses." *See* Victims of Trafficking and Violence Protection Act of 2000, § 112(b), Pub L. No. 106-386, 114 Stat. 1464, 1489–90 (2000). Congress recognized the threat to society that forced labor poses, which affects not just victims' "inherent dignity and worth," but also the "impact on the nationwide employment network and labor market" and "the rule of law." *See id.* § 102(b), 114 Stat. at 1468, 1467. It noted with criticism that existing laws were "inadequate to deter trafficking . . . failing to reflect the gravity" of this "evil requiring concerted and vigorous action." *Id.*

However, as the trial testimony established, forced labor is a difficult and elusive problem. Forced labor accounts for $236 billion in illegal profits annually, greater than the GDP of most countries; as of 2021, there were over 27.6 million people in forced labor across the globe. Francesca Francavilla et al., PROFITS AND POVERTY: THE ECONOMICS OF FORCED LABOUR 13, 3 (2024) (report by the International Labour Organization, funded by the French Ministry of Labour and the United States Department of Labor). Of that group, approximately 17.4 million people (63%) were held in privately imposed non-sexual forced labor exploitation, *see id.* at 3–4, approximately 5.5 million of whom were in the services sector, *see id.* at 4, just like the defendant's victims.

8

The highly competitive restaurant industry is one of the top five sites of labor trafficking in the United States, along with domestic work, agriculture, hotels and hospitality, and construction. *What Is Forced Labor?*, DEP'T OF HOMELAND SEC.: BLUE CAMPAIGN (Apr. 5, 2024), https://www.dhs.gov/blue-campaign/forced-labor; Colleen Owens et al., UNDERSTANDING THE ORGANIZATION, OPERATION, AND VICTIMIZATION PROCESS OF LABOR TRAFFICKING IN THE UNITED STATES 7 (2014) (National Institute of Justice-funded study). Food preparation and service jobs are the majority of low-wage leisure and hospitality work in the United States, with forced laborers and immigrants more often working in the back of the house, *id.* at 13, as the defendant's workers did.

In competitive industries where profit margins are low, traffickers have incentives to engage in criminal conduct. However, because of language and cultural barriers, and the fact that many victims work behind the scenes, forced labor often hides in plain sight, making it difficult for law enforcement to identify and pursue. With a significant possibility of evasion and incentives to engage in such conduct, proportionately significant sentences are required to deter would-be offenders. Accordingly, a substantial sentence is necessary to deter other employers who may consider engaging in forced labor schemes.

II.     The Court should impose a fine of $35,000.

The defendant committed these crimes, in part, to make money. And for many years, the defendant succeeded: his pizza businesses were successful, and he made money. Both his lifestyle and his assets reflect that success. As noted above, he lost hundreds of thousands of dollars gambling. In addition to the pizza shops and the corresponding real estate, Papantoniadis owns investment property in Rhode Island and his own home in Westwood, Massachusetts. PSR ¶¶ 169-171, 175, 175a. Furthermore, Papantoniadis chose not to provide complete information regarding his wife's assets or information regarding the actual value of Athenian Enterprises, Papantoniadis

9

Pizza, Inc., and Papantoniadis, LLC. It does not make sense that those entities would have "no value," particularly as at least one entity has a monthly income. *See* PSR ¶¶ 169, 175. Accordingly, the Court should view with skepticism any claim that Papantoniadis lacks the resources to pay a fine. A fine of $35,000 will reflect the financial motive for this crime and further deter this defendant and others from enriching themselves through criminal civil rights violations. *See* 18 U.S.C. § 3553(a)(2)(B).

### III. Crime Victim Rights Issues.

#### A. The Court should order full restitution for the victims.

Pursuant to 18 U.S.C. § 3663A(c)(1)(B), the victims are entitled to restitution in this case. In a separate filing, the government will provide an itemized restitution request for each of the victims. If the victims' losses are not ascertainable at the time of sentencing, the government requests that the Court set a separate restitution hearing within 90 days of sentencing. *See* 18 U.S.C. § 3664(d)(5).

#### B. Victims' Right to Address the Court at Sentencing.

The government hereby notifies the Court that each of the victims has submitted a victim impact statement. At this time, at least 3 victims have requested the opportunity to view the sentencing hearing via Zoom. *See* 18 U.S.C. § 3771(a)(4).

In addition, the government also provides notice that two other former employees of the defendant have requested an opportunity to address the Court regarding the impact of the defendant's conduct. *See* 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."). The Court "may take into account 'any information that has sufficient indicia of reliability.'" *United States v. Diaz-Rivera*, 957 F.3d 20, 27 (1st Cir. 2020) (quoting *United States*

*v. Diaz-Arroya*, 797 F.3d 125, 130 n.3 (1st Cir. 2015)). "In so doing, it has 'wide discretion to decide whether particular evidence is sufficiently reliable to be used at sentencing.'" *Diaz-Rivera*, 957 F.3d at 27 (quoting *United States v. Cintron-Echautegui*, 604 F.3d 1, 6 (1st Cir. 2010)).

## Conclusion

For the foregoing reasons and those to be stated at the hearing, the government requests the following sentence: 121 months' imprisonment; 3 years of supervised release, with the standard and mandatory conditions; fine of $35,000; restitution, as determined by the Court; and a special assessment of $600.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:    /s/ Brian A. Fogerty
BRIAN A. FOGERTY
TIMOTHY E. MORAN
Assistant United States Attorney

**CERTIFICATE OF SERVICE**

      I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants.

                                    /s/ Brian A. Fogerty
                                  Brian A. Fogerty
                                  Assistant United States Attorney

Date: October 21, 2024