**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| | ) | |
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **CRIMINAL No. 1:23-cr-10089** |
| | ) | |
| **STAVROS PAPANTONIADIS** | ) | |
| | ) | |

**STAVROS PAPATONIADIS' MEMORANDUM IN AID OF SENTENCING AND
MOTION FOR A DOWNWARD DEPARTURE**

Defendant Stavros Papantoniadis, by and through undersigned counsel respectfully submits the within memorandum to assist the Court in reaching an appropriate sentence under all the provisions of 18 U.S.C. § 3553(a). For the reasons set forth below, Mr. Papantoniadis respectfully requests that this Court depart from the advisory sentencing guideline range. All purposes of sentencing can be fully met with a committed sentence of 48 months followed by a period of supervised release.

On June 7, 2024, Mr. Papantoniadis was convicted after a jury trial of three (3) counts of forced labor in violation of 18 U.S.C. § 1589(a) and three (3) counts of attempted forced labor in violation of 18 U.S.C. §1589(a) and 18 U.S.C. § 1594(a). The jury acquitted Mr. Papantoniadis of one (1) count of forced labor.

As calculated by the Probation Department, the advisory guideline sentencing range ("GSR") of 121 to 151 months is based on a Total Offense Level of 32 and Criminal History Category of I. PSR ¶¶ 79-124, 181. As indicated in the addendum to the PSR, Mr. Papantoniadis objects to the following:

1. The government's request to apply the specific offense characteristic § 2H4.1(b)(1)(B) with regard to Count 2/Victim 2, because, according to the government, Victim 2 sustained a serious bodily injury to wit ingrown toenails. Mr. Papantoniadis agrees with

1

the Probation Office's assessment of the medical records and that Victim 2's ingrown toenails do not meet the definition of serious bodily injury or that the medical problem was caused by Mr. Papantoniadis' conduct. Rather, Victim 2 testified that his ingrown toenails were because "the shoes [he] had were very tight." Tr. 7 at 67.

2. The evidence at trial as to all six victims did not meet the requirements of the forced labor statute, 18 U.S.C. § 1589(a).

3. As to the attempted forced labor counts (Counts 5-7), under USSG §2X1.1(b) the base offense level for those counts should be decreased by three levels.

4. The enhancement imposed under USSG §2H4.1(b) is erroneously based on allegations that the period of alleged forced labor for five victims was over one year and for one victim was over six months. The duration of the alleged forced labor is different from – and less than – the duration of employment under USSG §2H4.1(b).

5. Regarding the enhancement of an alleged felony in addition to the forced labor of Victim 5, the evidence was that Victim 5 picked up a knife and turned towards the defendant. The defendant's response was in self-defense and in response to the provocation. It does not rise to a felony, but more likely a misdemeanor assault and battery. As to the Probation Office's position that an additional felony of strangulation occurred, the testimony was that the defendant grabbed Victim 5 by the shirt. Tr. 6 at 30. At no point did Victim 5 allege that the defendant strangled him or ever put his hands on his neck.

6. Regarding the enhancement based on facts that alleged a felony in addition to the forced labor of Victim 6, the evidence was that the defendant threw a pan in the direction of the sink where Victim 6 was washing dishes, not at Victim 6. This does not constitute a felony for assault with a dangerous weapon.

## I.   A SUBSTANTIAL VARIANCE FROM THE GSR IS WARRANTED IN THIS CASE.

This Court may not "presume that the Guideline range is reasonable" – they are merely a "starting point and the initial benchmark" and "are not the only consideration." *Gall v. United States*, 552 U.S. 38, 49-50 (2007). In sentencing Mr. Papantoniadis, this Court "should not consider itself constrained by the guidelines to the extent that there are sound, case-specific reasons for deviating from them. Nor should a sentencing court operate in the belief that substantial variances from the guidelines are always beyond the pale." *United States v. Martin*, 520 F.3d 87, 91 (1st Cir. 2008). In determining an appropriate sentence, this Court should consider "the nature and

circumstances of the offense and the history and characteristics of the defendant" and to impose a sentence which is "sufficient but not greater than necessary." 18 U.S.C. §3553(a). "[N]o limitation shall be placed on the information concerning the background, character, and conduct of [the defendant] which a court of the United States may receive and consider for the purposes of imposing an appropriate sentence." 18 U.S.C. § 3661.

The government is requesting a within guidelines sentence of 121 months. Doc. 171 at 1. A sentence of 121 months would be far greater than necessary to achieve the purposes of sentencing. Prior to trial, on May 8, 2024, the government represented that they discussed a potential resolution with the Chief of the Civil Rights and Human Trafficking Unit. Based on that discussion, they believed they could get approval for a Rule 11(c)(1)(C) plea of 78 months. *See Doc. 137 at 22.* While that plea took into consideration acceptance of responsibility, it also included a guilty plea to Count 1 of the indictment in which Mr. Papantoniadis was acquitted. In addition to being excessive under 18 U.S.C. §3553(a), the inflation from 78 months to 121 months has the appearance of imposing a trial penalty on a defendant who did nothing more than exercise his constitutional right to challenge the sufficiency of the government's case.

Mr. Papantoniadis hereby requests that this Court depart from the GSR based on (1) Mr. Papantoniadis' history and characteristics; (2) the circumstances of this case and deterrence; (3) the loss of caretaking from Mr. Papantoniadis' incarceration; (4) the business impact of Mr. Papantoniadis' incarceration; (5) Mr. Papantoniadis' physical health; (6) Mr. Papantoniadis' rehabilitative efforts; and (7) the need to avoid unwarranted sentencing disparities. All purposes of sentencing can be fully met with a committed sentence of 48 months.

### A.  History and characteristics of Mr. Papantoniadis

Stavros Papantoniadis was born on March 18, 1979, in Boston, Massachusetts. The son of immigrants from Greece, Mr. Papantoniadis was taught a strong work ethic at a young age. Mr. Papantoniadis began working at thirteen (13) years old and dropped out of high school in the 11th grade to help his parents in their restaurant business.

Without graduating high school or obtaining a GED, Mr. Papantoniadis became a respected businessman and spent decades establishing and growing a business that would provide for his family, friends, employees, and community. Through hard work and dedication, Mr. Papantoniadis built a successful chain of pizzerias in various locations in Massachusetts. Even with his success, he continued to devote his time to his pizzerias. As the manager, he began work every day at 4:30am traveling to each restaurant to prep food for the day and ensure everything was in order. Even with his success, no job was beneath him, and he worked alongside his employees.

As his business grew, so did Mr. Papantoniadis' family and there is nothing more important to him. Mr. Papantoniadis has been married for 22 years – in his own words, his wife is his best friend and "the best thing to happen to [him]." PSR at ¶148. They have four (4) children who are respectful, polite, and smart. The two older children, Anastasia (20 years old) and Gregory (18 years old) are currently in college. Peter (14 years old) is in the ninth grade and Georgia (10) years old) is in the sixth grade. The family is very close, and Mr. Papantoniadis is the heart of it all.

 

"[E]xtraordinary characteristics such as unusual family obligations or exceptional charitable activities may, in certain circumstance, provide a basis for a downward departure." *United States v. Grandmaison*, 77 F.3d 555 (1st Cir. 1996). The person described in the 58 letters submitted to this Court by family, friends, religious organizations, current and former employees, and acquaintances is not who this Court heard about during the trial in this case. Throughout the letters, Mr. Papantoniadis is described as extremely generous, caring, kind, hardworking, and dedicated to his family and community. It is quite of remarkable. While these letters were submitted in support of Mr. Papantoniadis, each letter describes just how much Mr. Papantoniadis supported others for so many years prior to his incarceration.

The following are excerpts from some of those letters from family and friends that are worth highlighting for this Court:

> *I watched my dad help many people who came to this country with little money or no job. He saw his own parents in these individuals and wanted to prevent them from suffering without food or resources, as his parents once did. He welcomed people into our home, providing meals to those who often had no family or food. His goal was to make them feel like part of our family and to offer our home as a safe haven. My dad treated his employees like family, always ensuring they left with full stomachs. This lesson was one he instilled in us as children. He taught us to be kind, to help those in need, and to love everyone around us. … Stavros is an incredible son, brother, husband, friend, and above all, father. He has always been my best friend and idol – a kind soul who puts others before himself.*
> - Anastasia Papantoniadis, daughter. *Exhibit 1* at 6-8 (character letters).

> *The Stavros that I know is respectful, kind, and caring. I have never seen him raise his voice to his children even when they did something wrong, he would always sit them down and speak to try to make them understand what they did was not right or gave them advise on what to do…. I have seen Stavros helping many people in the community family and friends. He has giv[en] to various organizations and even helping employees out. He even would open his home to people that needed somewhere to eat Sunday dinner or Christmas dinner. …He just helps everyone and anyone that needed it. Some of the ones that spoke ill about Stavros were the same ones there were at his dining room table eating amongst us.*
> - Georgia Sideropoulos, mother-in-law. *Id.* at 17-18.

> *Having known Stavros for 14 years, I have been a first-hand witness to the kindness, integrity, and dedication he has brought to many people's lives. One of Stavros admirable qualities is the dedication he has for helping others in need. I remember [he] head opened*

*his home to someone who had lost there's and with no question provided the temporary support that they needed to get back up on their feet. ... His kindness and the welfare of others above his own was always prioritized by him. These circumstances that he is in that have led to this point is not a reflection of his true character that I have always observed.*

- Colleen Papantoniadis, wife of Mr. Papantoniadis' nephew. *Id*. at 21-22.

*He has always been generous and understanding, flexible and kind to all. Anyone that truly knows him and his character will tell you the same thing. He would take the shirt off his back (and then some) and give it to you. That's just the type of person he is. He loves people, company, gathering, he loves bringing groups together to celebrate and have a good time. I don't know anyone quite like him. He really truly loves life and being social, bringing people together.*

- Betty Poulos, cousin. *Id.* at 24.

*Steve always put his workers, friends, and family before himself. Steve only wanted to be surrounded by his friends and people he cared about. While knowing Steve for the past 21 years we came over to their house for every holiday, every weekend, and multiple times a week. Steve would constantly invite his workers over to the house, feed them, clothe them, shelter them, help them financially, and never ask for any of it back. He cared about the people that worked for him and all his friends as they were all considered family.*

- John Sideropoulos, brother-in-law. *Id.* at 25.

*When I think of Stavros, with upmost honesty, two things strongly come to mind. His roburt sense of humor and unmatched extreme generosity. I have never witnessed another man (sometimes too much) help and give to others as much as he has. Over the years he has opened his heart, home and business to anyone that needed a job, a place to stay and food to eat. Never expecting or getting anything in return.*

- Pella Kioroglou, cousin. *Id.* at 27.

*Stavros is a one of a kind individual, he has always been the one you called on when you needed a helping hand or a shoulder to cry on. He is the one family or friend everyone wished they had in their lives....Stavros has always been an upstanding and respected member of our community, often going above and beyond to assist those in need. His compassion is not just limited to family; it extends into his professional and social circles as well. He has always been the one to donate for every church event to make it a successful fundraiser. He has always been the one at any given time a friend or family member would ask for help and without hesitation he would always be there to give and never expect anything in return.*

- Helen Kioroglou, cousin. *Id.* at 28.

*The person I know is a selfless individual, always ready to lend a helping hand. He would give anything to a stranger in need, a testament to his kind and generous nature.*

- Debbie Sideropoulos, sister-in-law. *Id.* at 29-30.

*Steve is a person who has always respected and cared about others. It was not uncommon for Steve to bring out one of his employees on a Saturday night when we were growing up.*

*Steve would introduce them to all of his friends and wanted them to be part of the group; Steve would have family parties and his employees would be at his house with his family and friends. To Steve they were not just employees they were family.*

- Tony Ciampa, friend for over 30 years. *Id.* at 48.

*He help[ed] one lady find a car and gave her the downpayment, when I asked why he told me "you help when you can"... I have witnessed him getting one workers into rehab centers and covering the cost, I have seen him give to people that I would not have thought about helping, he has helped people get jobs when no one else would give them one, even hired some workers back after they would quit and work for competitors or open there own places... I never seen anything remotely wrong with what was going on when he was around, on Fridays we would go out to dinner after work he would invite everyone that was working, didn't matter if you worked part time o[r] full time and it definitely didn't matter who or what you are.*

- John Polihronidis, friend and former employee. *Id.* at 50.

*I would call him a pillar in the community supporting so many without ever expecting anything in return. Especially when it came to strangers and people in need. His commitment to the community of Boston is a testament to his sense of duty and compassion towards others. This duty and compassion stems from his childhood. Being apart of an immigrant family all the responsibility that was set on him, especially when it came to keeping his families legacy alive.*

- Vasso Hinoporos, friend of over 40 years. *Id.* at 66.

*For all the years I've know[n] Stavros I have only seen him try and help his fellow human being, whether it be financially in time of need, or emotionally like when my mother passed away suddenly. He and his whole family did not leave my side during that nightmare. There was a time where I had no where to live and he welcomed me into his home until I was able to get back on my feet...I have seen Stavros help his employees in time of need from helping them buy an automobile, housing or food.*

- George Panitsidis, friend of over 40 years. *Id.* at 72.

As his family and friends described, Mr. Papantoniadis has always given back to his community and helped wherever and whoever he could. The following are excerpts from some of the organization or businesses he has supported or contributed to:

*Stavros has consistently shown his dedication to the well-being of others, particularly through his strong financial support of the church's philanthropic and educational work. He has never hesitated to contribute generously to initiatives that benefit the less fortunate and help foster educational growth within our parish and beyond. His participation in the life of our community has been active and meaningful, as he has regularly volunteered his time and resources to support various charitable causes and events.*

- Vassilios Bebis, Parish Priest at Saints Constantine and Helen Greek Orthodox Church (*Exhibit 1* at 77).

*Mr. Papantoniadis, although born in Boston, is originally from Kria Vrissi, where he has consistently demonstrated a profound commitment to charitable endeavors. His philanthropic efforts in our community have been both numerous and impactful. Mr. Papantoniadis has been a steadfast supporter of individuals and families in need, ensuring that assistance is available to all who require it. His generosity has significantly improved the lives of many residents and has fostered a spirit of solidarity and compassion within our community.*

*Furthermore, during his visits to Kris Vrisa, Mr. Papantoniadis has exemplified the qualities of a devoted family man and an upstanding citizen. His presence has always been a source of positivity and inspiration, and he has never caused any disturbances or issues. On the contrary, he has served as a role model, demonstrating integrity, kindness, and a strong sense of responsibility towards both his family and community at large.*

- Theodore Theodoridis, Former Deputy Regional Governor of Pella, Greece (*Id* at 75).

*Mr. Papantoniadis has been an integral member to our organization with his generous donations of food and other supplies every year when our annual dance is held, and also offering his personal help in the kitchen to help cook during functions. He would always attend our fundraisers and functions with his family and friends making sure they were successful and if they were not, he would find a way to make them successful for the benefit of the society.*

- The Committee of Pontiaki Estia of Mass. *Id*. at 78.

*I first met Steve in 2010 when I was at a very difficult period of my life. I was a recently divorced Indian women who had a deceptive realtor working with me. Steve stood up for me when he didn't even know me. We agreed to sign a lease and he would assist me in building a dental office on the 2nd floor of his building. He personally took me to meet with the Inspector's to obtain the permits necessary to completing the buildout of a dental office. Being a divorced Indian woman attempting to go out on my own in 2010, Steve provided me with a chance no one would have ever offered me.*

*Throughout my years of interactions with Steve, he has done many positive things for this community. He tried to assist and help others in this neighborhood. He really does care about his tenants and those who need his assistance. Steve's demeanor has always been respectful and kind, and I have no idea who they allege that person is before you. He has been there during the most challenging times in my life. During the pandemic, he showed an extraordinary amount of understanding and patience. He attempted to help and assist all his tenants during those serious economic times. He had genuine case for the well-being for those in his properties.*

- Seema Jacob, DDS, friend and commercial tenant. *Id.* at 59-60.

*Being a Dominican owned company that hires primarily Spanish employees, Steve is more than aware as to how to assist us in the community to grow our company. He has always been a very helpful landlord as well as a good person to us. He is very generous when it comes to giving help when needed. Steve possesses a great deal of integrity, and constantly strives to make sure he is doing the right thing for us. He has never once been rude to any*

*of us and has always respected the culture of my company. Another way I would describe
Steve's character is that he is respectful and takes pride in his family.*
- Romar Silvestre, commercial tenant of Mr. Papantoniadis (*Exhibit 1* at 73).

While this Court heard from eight (8) employees of Mr. Papantoniadis, he has employed

hundreds upon hundreds of people over the years. The following are excerpts from employees and

former employees attesting to Mr. Papantoniadis character and how they were treated by Mr.

Papantoniadis:

*I was originally hired as a cook and Stavros gave me the ability to become a manager. I
was not only a manager but at times I was also the translator for many of the Spanish
speaking employees. Stavros always had a Spanish speaking employee that could translate
per shift so there was any issues or problems it could be dealt with immediately. In my time
as a cook/management I have never seen nor heard any abuse, neglect, blackmail, or harm
done to an employee at any of the businesses owned by the family. I'm genuinely horrified
and disheartened by the allegations made against him.*
*As a person born in the Dominican Republic it's disgusting to hear how people have made
him out to be a monster against other immigrants. This man has been like a brother/father
figure to me, he has always been there for me and my family in anything and everything
I've needed to be able to maintain my household. I am the sole provider for my family and
Stavros has always made sure that I had a job and helped me whenever I needed it. When
my little brother passed away, he was the first one that helped me and that'd how he was
with all his employees. He always helped out and everyone knew that we were all treated
with respect.*
- Luis Romero, employee since 2014. *Ex. 1* at 33.

*During my time working in Stash's of Dorchester, at no point I have seen him unjustly or
treated any employee badly. When I would see him in the mornings, when I am about to
start my assigned shift for work, he would always treat me with respect, and he never talked
badly to me or any other person. I am grateful for the opportunity he has given me and the
treatment he has given me like a boss was very personable.*
- Christopher Rodriguez, employee for over 5 years. *Id.* at 34.

*In the period of time that I have been working for Steve, Mr. Steve has never been a bad
person. He always helped me improve my work. Mr. Steve was always very devoted to his
work and family.*
*He was never discriminative, always tried to assist others, he was never racist. He spent
most of the time telling us how to get better and explaining to us with patience.*
- Oliver Vizcaino, employee for approximately 2 years. *Id.* at 54-55.

*During my time at the establishment, Stavros Papantoniadis, the owner, was consistently
welcoming, generous, and fair. Even during the busy and chaotic lunch and dinner rushes,
Stavros remained calm under pressure and offered support to me and my fellow employees.*

- Michael Papargiropoulos, former employee. *Id.* at 67.

*In the period of time that I have been working for Steve, Mr. Steve has never been a bad person because he was always joking, he never was racists. He always helped me improve my work. Mr. Steve was always very devoted to his work and family.*
*He was never discriminative, always tried to assist others, he was never racist. He spent most of the time telling us how to get better and explaining to us with patience.*
- Henry Escobar, employee for approximately 2 years. *Id.* at 56-57.

*He is a gentleman to the T. He would pay us every Saturday on time. I learned a lot from this man, above all on how to work the proper way in a pizzeria with so much work. ... Judge Saylor I just wanted you to know how big of a heart Mr. Papantoniadis has he would always give gifts to the schools and churches. When we could not as employees of one of his stores could not agree on time off or vacation time among[] us, Mr. Papantoniadis would bring help from another store of his to help us out to get our days off or vacation time. Very hardworking, very smart and a good man are the words that I use to describe him.*
- Antonio Kotsis, former employee for over 3 years. *Id.* at 36.

*Steve has always treated me kindly and fairly, we were the other workers at Stash' Pizza. Even up to a few years ago, I would call Steve and let him know that people were looking for a job, and he would always say, "send him or her down."*
*I am Moroccan by birth and heritage, and a proud Muslim, while Steve is Greek and a devoted Orthodox Christian. I have known Steve to be friendly to people of all different nationalities and backgrounds, races, and religions. I was extremely honored that he invited me to attend his Greek Orthodox Church alongside his family, to celebrate Greek Independence Day. I even met his wonderful parents, Gregory and Anastasia. Steve is extremely proud to be an American, and he has given back to the community in terms of his time as well as financial contributions to various charities.*
- Radouane Bendriss, former employee. *Id.* at 52.

*He is a gentleman who always caters to his employees. He always paid us on time, Saturday nights, all the time, and in the rarest of circumstances when there was an error in the amount of hours worked, would always be compensated the following week.*
*When he had a craving for a breakfast sandwich from a nearby restaurant, he would make sure that all of us working that day would have one as well. When he would do his rounds of his different pizza shops in the morning, and would stop to get some donuts and pastries, he would make sure he would get enough for all of us.*
- Jerry Skordas, friend and employee for approximately 8 years. *Id.* at 61-64.

*I interacted with him regularly and never had any issues with his attitude. Maybe some times he was a little rough and strict but I excused him because in this line of business there were almost always problems with coworkers. People calling in sick. Not showing up at all. Coming late. Stealing.*
*I saw Steve, times over, helping workers with money advances for whatever need they had. He even offered me use of his car when I had no car. I would work for him again.*

- Polychronis Deligiannidis, former employee for over 2 years. *Id.* at 65.

*I never once saw Stavros abuse anyone. He expected that the employees would keep the place clean so that food could be prepared and sold to customers. He prided himself on having fresh food and clean restaurants for all of the people who would purchase at them. He only asked that the workers do their jobs as required and I never saw him scream or mistreat anyone. I know throughout all of the years, Stavros helped a lot of the employees when they needed assistance. I honestly believed he had a good relationship with his workers and helped many of them personally.*
- Vasilios Papadopolous, family friend and former employee. *Id.* at 49.

*Sundays at the Papantoniadis household were a testament to Steve's generosity and inclusive spirit. People from all walks of life, no matter age, race, or gender were welcome at his table, and anyone who sought his help never left empty-handed. I both witnessed and experienced Steve's generosity firsthand, and it left a lasting impression on me.*
- Joya Shenefield, former nanny. *Id.* at 46.

*As a woman and a Portuguese immigrant from the Azores, I can affirm that I have always been treated with the utmost respect by Steve… Steve is known for his fairness and respect towards others. In both his personal and professional interactions, he consistently treats people with kindness and ensures that his decisions are just and considerate of everyone's needs. This approach has earned him the trust and admiration of many, including myself.*
- Joyce Teixeira, friend and former property manager. *Id.* at 51.

What is overwhelmingly clear throughout all of these letters is the Mr. Papantoniadis is beloved by those who know him well and he is a pillar of support for his family, friends, community, and employees. A person can only achieve this kind of reputation by being a good person and consistently treating others with kindness and respect.

### B. Circumstances of the Offense and Deterrence

For purposes of sentencing, Mr. Papantoniadis is not contesting the evidence in this case and respects the jury's verdict. There is little question that forced labor is a serious federal offense, however, there are several factors that distinguish this case from other forced labor cases. That is, Mr. Papantoniadis never recruited or housed any of his employees nor did he confiscate passports or physically restrain anyone in anyway. As this Court heard at trial, the victims sought employment with Mr. Papantoniadis, recruited friends and family to work at the restaurants, were

paid above minimum wage, got raises when they threatened to quit, and in some instances did quit and returned. This case stands in stark contrast to the cases described *infra* at 16-20 where the defendants – also charged with forced labor – went to other countries to recruit victims, prevented victims from leaving the confines of their employment, withheld travel documents, controlled communications and finances, harbored victims in deplorable living conditions, and paid them sometimes less than a dollar per hour. Nonetheless, due to the broad reach of the statute, Mr. Papantoniadis is subjected to the same guideline as offenders engaging in far more serious conduct.

Mr. Papantoniadis' proposed sentence of 48 months imposes a significant punishment and deterrence upon him. Mr. Papantoniadis has already suffered severe collateral consequences because of his arrest, indictment, and conviction in this case, as well as the collateral Department of Labor civil suit[1]. Having spent decades of his life building a successful restaurant business and a positive reputation in his community, Mr. Papantoniadis has lost nearly everything he has worked for all before he was even convicted. While there is one restaurant remaining, it is not clear how long Mr. Papantoniadis' wife, Polyxeny Papantoniadis ("Paulina"),  will be able to keep it running without Mr. Papantoniadis and no bank will work with Mr. Papantoniadis or his family.

Moreover, Mr. Papantoniadis has already missed his oldest son's graduation from high school, moving him into college, and his first college football game. He will further miss his oldest daughter's graduation from college and younger son's graduation from high school. These are milestones that every parent hopes their children achieve and for which Mr. Papantoniadis will never experience – nothing can replace those moments that he has looked forward to for all of his children's lives. Put simply, the consequences already suffered and the consequences of a

---

[1] As indicated in the PSR at ¶177, Mr. Papantoniadis paid a total of $330,000 in minimum wage and overtime payments, liquidated damages, and a civil monetary penalty.

committed sentence of 48 months are surely enough to specifically deter this defendant from ever reoffending.

Likewise, the goal of general deterrence does not require a substantial period of incarceration. No rational human being aware of what has occurred to Mr. Papantoniadis would ever knowingly and intentionally choose to endure what he has experienced over the course of the last 19 months. A substantial sentence of incarceration is not necessary.

### C. Loss of caretaking

A sentence imposed within the GSR will cause a substantial, direct, and specific loss of essential caretaking and financial support to Mr. Papantoniadis' family.

Mr. Papantoniadis' wife, Paulina, was primarily responsible for the four (4) children while Mr. Papantoniadis managed the business and provided financially. Since his arrest, Paulina has struggled to care for the children and provide financially. Six (6) of the seven (7) restaurants have since closed. Paulina works up to 72 hours a week at the one (1) remaining restaurant in Roslindale trying to keep the business open. While the Roslindale restaurant used to be profitable, because of the instant case, there has been a significant decline in sales which often do not cover the costs of payroll, food, and monthly utilities. As a result of this case, banks are unwilling to do business with the Papantoniadis family (see *Ex. 1* at 45) and Paulina had to resort to obtaining a personal loan from her mother to keep the Roslindale store open. Paulina's mother, however, cannot continue to provide personal loans and Paulina will not be able to hang on much longer.

Mr. Papantoniadis is an involved father who takes pride in his children and their accomplishments. He strives to provide all of the opportunities he did not have. Since his arrest, the children have been bullied, struggled emotionally, and suffered anxiety. They are currently in therapy to deal with the stress and hardships of having an incarcerated parent. The youngest,

Georgia, will be most affected by a long period of incarceration of Mr. Papantoniadis due to her young age and how close she is to her father. He is her hero. *Ex. 1* at 3-4. As this Court is surely aware, young children with an incarcerated parent "face formidable cognitive and health-related challenges throughout their development." *Both Sides of the Bars: How Mass Incarceration Punishes Families*, Prison Policy Initiative, Leah Wang, August 11, 2022, available at https://www.prisonpolicy.org/blog/2022/08/11/parental_incarceration/ (last accessed October 17, 2024).



Moreover, since Mr. Papantoniadis lost his father in January 2020, Mr. Papantoniadis has been the sole caretaker of his mother and younger brother. *Ex. 1* at 16. His mother, Anastasia, is currently 74 years old and has various health issues including the beginning stages of dementia. His younger brother is 47 years old and has mental health issues and special needs. PSR at ¶147. A significant period of incarceration will have a detrimental impact on both Mr. Papantoniadis' mother and brother.

While most defendants incur some degree of financial hardship and families suffer to some extent from the absence of a parent or caretaker through incarceration, Mr. Papantoniadis' financial

support and caretaking is irreplaceable to his wife and children, his mother, and his younger brother.

### D. Business Impact

As previously stated, Mr. Papantoniadis has already lost nearly everything in terms of his businesses and reputation. However, further irreparable damage could result to the one remaining restaurant and the employees that depend on that restaurant for their livelihood. As the First Circuit has long recognized, "job loss to innocent employees resulting from incarceration of a defendant" is a valid and necessary consideration at sentencing. *United States v. Olbres*, 99 F.3d 28, 36 (1st Cir. 1996); *United States v. Milikowsky*, 65 F.3d 4, 9 (2d Cir. 1995) (affirming downward departure that was granted on basis of economic impact on the defendant's business, stating, "departure may be warranted where, as here, imprisonment would impose extraordinary hardship on employees). See also *United States v. Holz*, 118 F. App'x 928, 941 (6th Cir. 2004) (the likely impact of Defendant's incarceration on his family, and its likely impact on his business, including "a handful of employees [who] would lose work if Defendant were incarcerated" warranted a downward departure). As Luis Romero described in his letter to this court, Romero is "the sole provider for [his] family and Stavros has always made sure that [he] had a job and helped [him] whenever [he] needed it." *Ex. 1* at 33. See also *Ex. 1* at 34 (letter from Christopher Rodriguez) and at 56 (letter from Henry Escobar).

### E. Mr. Papantoniadis' physical health.

As recounted in the PSR and confirmed by medical records, Mr. Papantoniadis suffers from a variety of health issues since his detention. See PSR ¶¶158, 159. These health issues include:

- Degenerative disk disease with reduced cartilage in his spine which causes pinched nerves and numbness in his arms and legs;
- A left inguinal hernia;
- Nodules on his liver which may be chronic liver disease;

- A cracked wisdom tooth that the prison has refused to remove due to the tooth's long roots to the mandibular nerve;
- An intestinal issue or a bleeding ulcer resulting in blood in the stool;
- Golf-ball-sized cysts on his left nipple that have been drained but continue to grow back;
- High cholesterol;
- Right leg edema;
- An enlarged prostate; and,
- Acid reflux

Most of these issues have gone unaddressed while detained at Wyatt Detention Facility. *Id.* Given Mr. Papantoniadis' age and lack of adequate medical care, his health conditions are only going to worsen without medical intervention.

### F. Rehabilitative efforts.

While detained, Mr. Papantoniadis has used his time productively to better himself. He meets with counselors regularly, works in the kitchen, takes e-learning classes through his tablet, and participates in the BOSS program which is an inmate-led restorative justice program. PSR at ¶¶ 5, 160. See also *Exhibit 2* (records from Wyatt Detention Facility). As reflected in the letter from the Warden of Wyatt Detention Facility, Mr. Papantoniadis has participated in the Detainee Worker Program since August 2023 – first as a Pod Runner, then as a kitchen worker since September 6, 2023. *Ex. 2.* He has not received any disciplinary violations and has received excellent and good work evaluations for his assignment as a kitchen worker. PSR at ¶5.

Mr. Papantoniadis has also continued to be devoted to his faith and requested that a Greek Orthodox priest hear his Confession and administer the Sacrament of Holy Eucharist. Fr. Romanos Karanos, PhD, Presiding Priest at Annunciation Greek Orthodox Church visited Mr. Papantoniadis visited Mr. Papantoniadis in August and September 2024. In a letter to this Court, Fr. Romanos Karanos attested to Mr. Papantoniadis' sincerity, repentance for sins, and love for his wife and

children. In Fr. Romanos Karanos' view, Mr. Papantoniadis "does not pose a threat to society…and he is eager and ready to be a hard-working and upright citizen.". *Ex. 1* at 76.

### G. The need to avoid an unwarranted sentencing disparity.

Other than Mr. Papantoniadis' case, it appears that there have been just four (4) forced labor cases prosecuted in the district of Massachusetts in the 24 years since the statute was enacted. 18 U.S.C. § 1589. See *Trafficking Inc.: Forced Labor in Massachusetts*, GBH News, Jenifer McKim and Sarah Betancourt, available at https://www.wgbh.org/news/local/2022-10-11/trafficking-inc-forced-labor-in-massachusetts (last accessed October 18, 2024).

In *United States v. Al Jader*, 1:05-cr-10085-RCL, the defendant exploited the labor of a series of foreign domestic servants. Doc. 73 at 1. After two of the defendant's workers ran away, the defendant recruited and brought two Indonesian workers to the United States. *Id.* at 2-3. Their employee contract stated that they would be paid a monthly salary of $1400, be provided room and board and medical expenses, and would not have their passport/travel documents withheld. *Id.* at 3. When they arrived in the United States, the defendant paid then a monthly salary of $300 and confiscated their passports. *Id.* They were not permitted to leave the house without permission and warned that if they left the house, police would catch them because they did not have proper documents. *Id.* For nearly two years, they worked 15 hours a day, 7 days a week – less than 67 cents an hour. *Id.* at 4. They slept on foam mats and were dependent on the defendant to supply all of their needs. *Id.* The defendant pleaded guilty to lesser charges of Visa Fraud and Harboring for Financial Gain and was sentenced to probation for a term of 2 years, with the first six months to be served in home detention, and 100 hours of community service. Doc. 91. The forced labor charges were dismissed.

The first case to result in a conviction for forced labor in this district was *United States v. Wei*, 1:10-cr-10096-GAO. In that case, Hong Wei was charged with various crimes stemming from running at least twenty brothels over the course of six (6) years, forcing women to engage in prostitution and some to work at the brothels as cleaners. Doc. 149 at 2-3. Wei was "the boss" of the organization – she recruited women by advertising outside of Massachusetts for jobs in the "massage" business, assisted with the travel to Massachusetts, leased the properties, dealt with the male customers, and managed the women at her brothels. *Id.* at 3-4. Specific to the forced labor charge, Wei obtained a housekeeper from an employment agency. *Id.* at 4. The housekeeper was driven to one of the brothels and told she would be responsible for the cooking and cleaning for the women at the brothels. *Id.* When the housekeeper did not want to stay in the brothel, Wei told the housekeeper that she had to keep working there until she was replaced, intimidated her, and caused her to fear that the police would arrest her if she tried to leave. *Id.* Another women, who was not in the United States legally, was offered to stay at Wei's brothel for $25 a day. *Id.* at 4-5. On her second day there, she wanted to leave, and Wei told her she could pay the rent by engaging in prostitution. *Id*. at 5. Wei intimidated the woman, and she was not allowed to leave until another woman was found to replace her. *Id.* Pursuant to a Rule 11(c)(1)(B) plea agreement, Wei argued for a sentence of 60 months while the government argued for a sentence of 87 months. Wei and co-defendant Jing Liang Chen each received a committed sentence of 60 months on all counts to run concurrently and five (5) years of supervised release. Docs. 153, 163.

The case of *United States v. Moreno, et al.,* 1:21-cr-10175-ADB is currently pending. In that case, the defendants are accused of targeting and recruiting migrants to work in restaurants owned by the defendants and then smuggling those individuals from Brazil into the United States for $12,000 to $22,000. Doc. 114 at 2-3. Once in the United States, the defendants arranged for

the victims to rent or share the rental of one of the apartments owned or controlled by the defendants. *Id.* at 6. The defendants are further accused of forcing the victims to work long hours at their restaurants, perform difficult manual labor, and subjecting the migrants to threats of financial harm, violence, and deportation. *Id.* at 6-8. One of the migrants reported being paid only $3 per hour and all wages were withheld from the victim to pay for rent. *Id.* at 7.

There are a few out-of-state cases that this Court should take into consideration to avoid unwarranted sentence disparities. Each case is briefly summarized below:

| CASE | GSR[2] | SENTENCE | SUMMARY OF FACTS |
|---|---|---|---|
| *United States v. Balcazar*, 3:21-cr-00834 (D.S.C.) | 63-78 | 40 months | The defendants recruited 55 victims from Mexico to work for them doing farm labor. Once in the U.S., the defendants confiscated the victims' passports. The victims were forced to work as many as 90 hours per week and were not paid overtime or the promised wages. The defendants threatened the victims with deportation if they did not work hard enough. One of the defendants carried, brandished, and discharged a firearm to as a show of force to the victims. The victims stayed at a camp facility where they were locked in and there were armed guards posted at the camp facility. Docs. 3, 132. See also https://www.justice.gov/usao-sc/pr/three-lexington-county-defendants-sentenced-federal-court-labor-trafficking-and-fraud. |
| *United States v. Tran*, 0:14-cr-00025 (D. Minn) | 30-37 | 1 year, 1 day | The defendant recruited the victim from Vietnam using false promises of legal immigration status and a high-paying job. The defendant then smuggled the victim across the U.S.-Mexico border, imposed significant debt upon the victim, and forced the victim to pay the smuggling debt by working at the defendant's son's restaurant. At the restaurant, the victim had to work long hours without pay and |

---

[2] As calculated by the PSR in each case.

| | | | |
|---|---|---|---|
| | | | was intimidated by the defendant placing her in fear. See FBI Press Release, December 16, 2014, available at: https://www.fbi.gov/contact-us/field-offices/minneapolis/news/press-releases/mankato-minnesota-woman-sentenced-in-forced-labor-case |
| *United States v. Avelenda,* 2:11-cr-00949 (C.D. Cal.) | 87-108 | 60 months incarceration | A 17-year-old El Salvadoran teenager answered a newspaper advertisement for a job working as a caretaker, cook, and domestic worker in the U.S. The defendant arranged for the victim to be illegally smuggled to the U.S.. Upon arrival the defendant was physically and mentally abusive, did not allow the victim to leave the house, and threatened to contact police if she tried to run away. The defendant forced the victim to sleep in his bed, have sex with him, and perform sex acts on video. Doc. 76 at 6-7. |
| *United States v. Bradley,* 1:03-cr-00061 (D.N.H.) | 70-87 | 70 months incarceration (pre-*Booker*) | The defendants (husband and wife) traveled to Jamaica on two different occasions and recruited seasonal workers to work at their tree removal company. When the first set of workers arrived in the U.S. they were forced to live in a camping trailer without running water, electricity, or heat. While they were promised $15-20 an hour, they were paid $7 per hour. After one worker escaped, the defendant called him and threatened to travel to his location with a gun. The defendant then confiscated the passport and plane tickets of the other worker. When the defendants recruited a second group of workers from Jamaica, the defendants told them they planned to "destroy" the victim who fled. These workers were also badly housed and ill-treated. The defendants impeded access to medical care, restricted their freedom, abused them, had their dog attack a worker who attempted to flee, and closely monitored each victim outside of the defendants' property. Docs. 98, 100; |

| | | | |
|---|---|---|---|
| | | | *United States v. Bradley*, 390 F.3d 145 (1st Cir. 2004). |
| *United States v. Calimlim*, 2:04-cr-00248 (E.D. Wis.) | 108-135 | 72 months | At 19 years old, the victim traveled to the U.S. to work for the defendants as a live-in housekeeper. When she arrived, the defendants confiscated her passport and told her she was in the U.S. illegally. For over nineteen (19) years, the defendants forced her to work 6:00 a.m. to 10:00 p.m. seven days a week. The victim was paid a total of about $19,000 -- $1,000 per year. The defendants controlled the victim's communications and finances. In the nineteen years she worked for the defendants, she was allowed to speak to her family four or five times while being monitored by the defendants. She was not allowed to leave the home, could not seek medical care, and could not answer the door. During social functions at the home, she could not leave her room in the basement, even to use the bathroom. Docs. 215, 357; *United States v. Calimlim*, 538 F.3d 706 (7th Cir. 2008). |

As the above cases illustrate, a departure from the guidelines is in line with other forced labor cases in this district and across the country. Accordingly, the sentence advocated for herein – 48 months incarceration – would be consistent with the sentences imposed on similarly situated defendants.

## CONCLUSION

Mr. Papantoniadis submits that the purposes of sentencing, taking into account the several individualized circumstances attendant to this case, would be well served, and justice accomplished, by the Court's varying from the GSR and imposing a committed sentence of 48 months. For all the reasons set forth herein Mr. Papantoniadis respectfully requests leniency from this Court.

Respectfully Submitted
Stavros Papantoniadis,
By his attorneys,

/s/ Carmine P. Lepore
Carmine P. Lepore
Lepore & Hochman, P.A.
One Sprague Street
Revere, MA 02151
(781) 286-8800
BBO# 564603

/s/ Steven Boozang
Steven C. Boozang
439 Washington Street
Dedham, MA 02026
(781) 251-9991
BBO# 659216

/s/ Robert L. Sheketoff
Robert L. Sheketoff
Sheketoff & O'Brien
One McKinley Square
Boston, MA 02119
(617) 367-3449
BBO# 457340

/s/ Ashley P. Allen
Ashley P. Allen
Law Office of A.P. Allen
7 Elm Steet, Suite 348
Boxford, MA 01921
(617) 925-7888
BBO# 697825

October 22, 2024

## CERTIFICATE OF SERVICE

I, Ashley Allen, attorney for the Defendant, certify that this document filed through the ECF System will be sent electronically to the registered participants as identified on the Notice of Electronic Filing.

/s/ Ashley P. Allen
Ashley P. Allen