## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **UNITED STATES of AMERICA** | ) | |
| | ) | |
| | ) | **Criminal Action No.** |
| **v.** | ) | **23-10089-FDS** |
| | ) | |
| **STAVROS PAPANTONIADIS,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER ON
## <u>DEFENDANT'S MOTION FOR A NEW TRIAL</u>

**SAYLOR, C.J.**

This is a motion for a new trial by a criminal defendant.  In June 2024, after a ten-day trial, defendant Stavros Papantoniadis was convicted by a jury of six counts of forced labor in violation of 18 U.S.C. § 1589(a).[1]

Defendant owns and operates a number of pizza restaurants in the Boston area; the seven identified victims were his employees.  All seven were in the United States unlawfully.  The government's theory of the case was that defendant forced the victims to work at his restaurants through threats and coercion, including threats of physical harm, retaliation, and possible reporting of their illegal status to immigration authorities.  All of the victims were promised, and were provided, immigration benefits in return for their testimony.

Two weeks after the jury's verdict, defendant moved for a new trial under Fed. R. Crim. P. 33(a).  He contends that the government "failed to timely disclose discovery in violation of [its] discovery obligations pursuant to Fed. R. Crim. P. 16, Local Rules 116.1 and 116.2, *Brady*

---

[1] The indictment charged seven counts, involving seven victims; the jury acquitted defendant as to one of the counts.

*v. Maryland*, 373 U.S. 83 (1963), and *United States v. Giglio*, 405 U.S. 150 (1972)." (ECF 135 at 1). He further alleges that the government failed to disclose "nearly 40,000 pages of material and relevant discovery until shortly before trial," which deprived him of a fair trial and due process of law, and that the Court abused its discretion by granting a continuance of only eight days, rather than the five months that he requested.

It appears that defendant's contention that the government violated its discovery obligations is correct in several respects. First, the government was required under Local Rule 116.2(b) to produce evidence of promises, rewards, or inducements to witnesses, including immigration benefits, within 21 days of arraignment. The information that the government did provide by that deadline was inaccurate and incomplete, and the government did not correct or supplement its response until 28 days before trial, more than a year later. Second, the government was required under Local Rule 116.2(b) to provide witness impeachment materials no later than 21 days before trial. Some impeachment information was not provided, however, until five days before trial. And it is also true that the government produced a high volume of discovery in a short period of time before trial.

Nonetheless, defendant has not established that he is entitled to a new trial. The late disclosures by the government—while certainly improper—were not, in context, unduly prejudicial. Defendant has not established either specific prejudice or that "there is a reasonable probability that, had the evidence been disclosed to the defense in a [timely] manner or had the trial court given the defense more time to digest it, the result of the proceeding would have been different." *United States v. Perez-Ruiz*, 353 F.3d 1, 8-9 (1st Cir. 2003).

To begin, there is no claim that any evidence was actually withheld by the government. Nor is there any credible claim that any of the late-disclosed materials constituted exculpatory information within the meaning of *Brady*.

The late disclosure of the specific immigration benefits provided to the victims had virtually no adverse impact. Again, all seven victims were defendant's employees. The principal defense strategy at the trial was to attack the credibility of the victims on the ground that they had a strong motive to lie, because each had been promised and received immigration benefits in return for testifying. The basic facts underlying that strategy—including the fact that the victims had been promised and received immigration benefits—were known to defendant from the very outset of the case, even if all the details were not. And the possible motive of the victims to fabricate their testimony in order to obtain immigration benefits was explored at length through cross-examination at trial.

The late disclosure of impeachment material, although perhaps a closer call, likewise did not result in undue prejudice. That material consisted principally of victim statements contained in (1) the files of a 2017 Department of Labor civil investigation into defendant's failure to pay his employees in accordance with federal law and (2) the files of Citizenship and Immigration Services concerning the applications of those victims for immigration benefits. The statements largely concerned the interest of the victims in obtaining immigration benefits—again, a subject of potential impeachment that was already well-known to the defense.

Defendant's complaints about the volume of the discovery production on the eve of trial, while not entirely unfounded, are exaggerated. Almost all of the production consisted of the files of the CIS immigration files concerning the victims and the DOL civil investigation files. As noted, defendant had long been aware of the promise and/or fact of immigration benefits. He

was also very much aware of the DOL investigation, as it had led to a lawsuit against him for unpaid wages, and ultimately resulted in a 2019 civil settlement involving all but one of the criminal victims. Indeed, the overwhelming majority of the DOL records produced by the government in this proceeding were defendant's own business and payroll records, and which were essentially immaterial to the criminal prosecution.

It is true that the production of the records was last-minute and somewhat disorganized, and defense counsel had fair reason to complain about its volume and timing. Nonetheless, the task of reviewing them to locate the victim statements was not as daunting as defendant suggests. The documents were in English. The victim statements appear to have been relatively brief. They concerned a relatively simple and straightforward set of crimes, not a complex set of business transactions. And defendant was represented by not one, but four experienced criminal-defense lawyers, all of whom had active roles in the trial, and who were supported by a paralegal with a law degree. In short, defendant's contention that the government produced tens of thousands of pages of documents on the eve of trial, while technically accurate, considerably overstates the nature of those records, the burden of reviewing them, and their importance to the trial.

In any event, and most importantly, defendant has failed to establish how he was specifically and unfairly prejudiced by the late disclosures or that there is any reasonable likelihood that the result of the trial would have been different. Put another way, he has not shown that because of the delay, he was not able to pursue a "plausible strategic option." *United States v. Smith*, 292 F.3d 90, 102 (1st Cir. 2002).

Under the circumstances, defendant has not met the standard for a new trial under Rule 33. For that reason, and the reasons set forth below, the motion will be denied.

I.    **Background**

Defendant operated a chain of restaurants in the Boston area, including several locations called "Stash's Pizza."  In 2017, the Department of Labor investigated, and eventually filed suit against, defendant and his corporate entities for failure to pay required minimum wages and overtime compensation.  In the course of the litigation, the various entities produced payroll and other business records to the DOL.  That lawsuit was settled in 2019.  As part of the settlement, defendant agreed to pay compensation to several former employees, some of whom were identified victims and testified during his criminal trial.

On March 16, 2023, a criminal complaint against defendant was unsealed, charging him with one count of forced labor in violation of 18 U.S.C. § 1589(a).  Although the complaint only charged a single count involving a single victim, the accompanying affidavit described defendant's conduct targeting six other former employees.  It also disclosed that each of the seven alleged victims were promised and/or had received certain immigration benefits for their cooperation in the government's investigation.

On March 20, 2023, a probable cause and detention hearing was held before Magistrate Judge Judith G. Dein.  During that hearing, defense counsel elicited testimony from a Homeland Security Investigations ("HSI") agent that the victims had received immigration benefits for their cooperation with law enforcement.  Counsel later argued that those benefits gave victims a substantial incentive to fabricate their statements.  Magistrate Judge Dein found cause to detain defendant pending trial.

Defendant sought review of that decision from this Court, which was denied, and then from the First Circuit, which affirmed it.  On appeal, defense counsel asserted, among other things, that the court had not given appropriate weight to the substantial motives of the victims to fabricate their allegations in exchange for immigration benefits.

On March 29, 2023, a grand jury returned a seven-count indictment against defendant for (1) four counts of forced labor in violation of 18 U.S.C. § 1589(a) and (2) three counts of attempted forced labor in violation of 18 U.S.C. §§ 1589(a) and 1594(a). The indictment named seven victims. None were identified by name; instead, it referred to them as "Victim 1" through "Victim 7."

Between April 2023 and November 2023, the government produced a substantial amount of discovery to the defense, including witness interview statements for the seven victims. At that stage, the names of the seven victims were redacted; they were identified only by number.

By July 18, 2023, three criminal-defense attorneys had entered appearances on behalf of defendant: Carmine Lepore (on March 18, 2023); Steven Boozang (on June 10, 2023); and Ashley Allen (on July 18, 2023). Those three were eventually joined by Robert Sheketoff, who entered an appearance on May 13, 2024, approximately two weeks before the start of the trial.

On December 6, 2023, the Court scheduled the case for trial beginning on May 20, 2024.

The government had seized defendant's cell phone at the time of his arrest, on March 16, 2023, from which it extracted (among other things) various text messages, photos, and videos. Pursuant to the Adam Walsh Act, 18 U.S.C. § 3509(m), the government did not release the entirety of the cell-phone data to the defense because of the apparent presence of a child pornography video.[2] (ECF 148 at 12). The government did, however, arrange multiple sessions in January and April 2024 where defendant and his counsel reviewed the cell-phone data in person. The government also cooperated with defense counsel to extract specific images from defendant's phone. (*Id.* at 16-17).

---

[2] Defendant disputes that the video is, in fact, child pornography. (ECF 137 Ex. 14 at 4).

On April 30, 2024, the government provided a discovery letter that disclosed the victims' names and the specific immigration benefits they received.  (*Id.* at 17)

On May 3, 2024, the government produced more than 18,000 pages of material from the DOL, including additional Jencks Act material and business records.[3]  (*Id.* at 18).

On May 8, 2024, twelve days before trial was scheduled to begin, defendant moved to continue the trial until September 30, 2024, a period of nearly five months.  As ground for that motion, defense counsel asserted that although the government had "provided discovery in a timely manner," they were unable to "process the sheer volume of discovery with proper attention and detail."  (ECF 95 at 1).  The Court granted the motion in part; jury empanelment remained scheduled for May 20, but the trial itself was rescheduled to commence eight days later, on May 28, 2024.

On May 22 and May 24, 2024, the government produced copies of text messages and emails from defendant's phone, and allowed a defense paralegal to obtain copies of photographs and videos of material from the phone.  (ECF 148 at 16-17).

On May 23, 2024, five days before the start of the trial, the government produced approximately 1,600 pages of information from CIS immigration files.  (ECF 137 Ex. 1 at 10).

Beginning on May 28, 2024, the Court presided over a ten-day jury trial.  The government called ten witnesses, including the seven alleged victims.  On June 7, 2024, the jury found defendant guilty on three counts of forced labor and three counts of attempted forced labor, and (as to Victim 1) acquitted him of one count of forced labor.

---

[3] The government produced the documents in the form of .pdf files on a disk.  (ECF 135 at 10 n.6).  According to defendant, it did not actually receive the files until May 6; it advised the government on May 9 (three days later) that it was unable to access the files on the disk; and that the government did not produce the files in a different format until May 17 (eight days later).  (ECF 137 Ex. 1 at 5).

Defendant has now moved for a new trial. As the basis for his motion, he asserts that the government improperly withheld or delayed the disclosure of evidence material to his defense, and unfairly produced an overwhelming volume of evidence on the eve of trial. He also contends that the Court abused its discretion in granting a continuance of only eight days after his counsel requested nearly five additional months to review the produced discovery.

## II.     Standard of Review

Rule 33 provides that a "court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). As a general principle, "[t]he remedy of a new trial is to be granted sparingly and only to avoid a miscarriage of justice." *United States v. Garcia-Alvarez*, 541 F.3d 8, 16-17 (1st Cir. 2008).

## III.     Analysis

### A.     Applicable Legal Standards

#### 1.     *Brady* and *Giglio* Materials

In *Brady v. Maryland,* the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. 83, 87 (1963). In *Giglio v. United States*, the court similarly held that the government must disclose information relevant to a witness's credibility, including impeachment evidence. *See* 405 U.S. 150, 154-55 (1972); *United States v. Bagley*, 473 U.S. 667, 676 (1985).

#### 2.     Local Rules Concerning Discovery

Rule 16(a) contains various provisions for the production of discovery in criminal cases, including rules concerning the government's disclosure of statements by the defendant, the defendant's criminal record, physical evidence, and reports of examinations and tests. Fed. R.

Crim. P. 16(a).  Rule 16 addresses discovery generally; it does not address the timing of disclosures.[4]

Various local rules adopted by the District of Massachusetts also address the government's obligations to produce discovery in criminal cases, including the timing of various disclosures.  Among other things, Local Rule 116.2(b)(1) requires production of exculpatory information and information concerning promises, rewards, or inducements within 28 days of arraignment, and Local Rule 116.2(b)(2) requires the production of potential witness impeachment material 21 days before trial.[5]

### 3.     Jencks Act

The Jencks Act, 18 U.S.C. § 3500, provides in part that "no statement or report in the possession of the United States which was made by a Government witness or prospective

---

[4] The only exception is the provision concerning expert disclosures; Rule 16 provides that "[t]he court, by order or local rule, must set a time for the government to make its disclosures," and that "[t]he time must be sufficiently before trial to provide a fair opportunity for the defendant to meet the government's evidence." Fed. R. Crim. P. 16(a)(1)(G)(ii).

[5] As relevant here, Local Rule 116.2(b)(2) provides:

(2) Not later than 21 days before the trial date established by the judicial officer who will preside at the trial [, the government must provide]:

(A) any information that tends to cast doubt on the credibility or accuracy of any witness or evidence that the government anticipates calling or offering in its case-in-chief,

(B) any inconsistent statement, or a description of such a statement, made orally or in writing by any witness whom the government anticipates calling in its case-in-chief, regarding the alleged criminal conduct of the defendant;

(C) any statement or a description of such a statement, made orally or in writing by any person, that is inconsistent with any statement made orally or in writing by any witness the government anticipates calling in its case-in-chief, regarding the alleged criminal conduct of the defendant;

(D) information reflecting bias or prejudice against the defendant by any witness whom the government anticipates calling in its case-in-chief; [and]

(E) a written description of any prosecutable federal offense known by the government to have been committed by any witness whom the government anticipates calling in its case-in-chief . . . .

Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case." 18 U.S.C. § 3500(a).  *See* Fed. R. Crim. P. 16(a)(2) ("Nor does this rule authorize the discovery or inspection made by prospective government witnesses except as provided in 18 U.S.C. § 3500").

If the Jencks Act were to be applied literally—that is, if witness statements were not produced until midstream at trial, after the conclusion of direct testimony—it would be grossly impractical and could create a substantial potential for unfairness to the defendant.  Furthermore, there is often a substantial overlap between statements covered by the Jencks Act and statements that might be used to impeach a witness under Local Rule 116.2(b)(2).  Accordingly, it is the near-universal practice in this District for Jencks Act material, not otherwise required to be produced, to be produced no later than 21 days in advance of trial.[6]  In many instances, however, the government agrees to produce all or some of the material at an earlier stage.  The Court does not, however, have the authority to force the early production of Jencks Act material that is not covered by *Brady*, *Giglio*, or one or more provisions of Rule 16 or Local Rule 116.2.

### 4.    Standard for New Trial for Discovery Violation

A defendant seeking a new trial on the basis of a *Brady* or *Giglio* or other discovery violation bears the burden to establish that (1) the evidence was unknown or unavailable to him at the time of trial; (2) the failure to learn of the evidence was not due to his own lack of diligence; and (3) a reasonable probability that, had the evidence been disclosed in time to permit its use at the trial, the result of the proceeding would have been different.  *See United States v. Tucker*, 61 F.4th 194, 207 (1st Cir. 2023); *see also United States v. Laureano-Salgado*, 933 F.3d

---

[6] Defendant incorrectly asserts that "Local Rule 116.2(b)(2) requires that the prosecutors disclose Jencks material no later than 21 days before the trial date."  (ECF 135 at 8.)  The Local Rule does not so provide, and if it did, it would violate both Fed. R. Crim. P. 16(a)(2) and the Jencks Act itself.

20, 28 (1st Cir. 2019). That standard "requires an analysis of whether the trial, in the absence of the undisclosed evidence, resulted in a verdict 'worthy of confidence.'" *Id.* (quoting *Gonzalez-Gonzalez*, 258 F.3d at 20).

A similar standard applies if the disclosure of the evidence in question was delayed, rather than concealed. In such cases, "the defendant further must show 'that the delay prevented defense counsel from using the disclosed material effectively in preparing and presenting the defendant's case.'" *United States v. Cruz-Feliciano*, 786 F.3d 78, 87 (1st Cir. 2015) (quoting *United States v. Van Anh*, 523 F.3d 43, 51 (1st Cir. 2008)). *United States v. Delgado-Marrero*, 744 F.3d 167, 199 (1st Cir. 2014) ("When *Brady* or *Giglio* material surfaces belatedly, the critical inquiry is not why disclosure was delayed but whether the tardiness prevented defense counsel from employing the material to good effect.") (quoting *United States v. Perez-Ruiz*, 353 F.3d 1, 8 (1st Cir. 2003)). A defendant must therefore show "(1) some specific prejudice beyond a mere assertion; and (2) that there is a reasonable probability that, had the evidence been disclosed to the defense in a [timely] manner or had the trial court given the defense more time to digest it, the result of the proceeding would have been different." *Perez-Ruiz*, 353 F.3d at 8-9. A defendant claiming prejudice resulting from a delayed disclosure "must at a minimum make a *prima facie* showing of a plausible strategic option which the delay foreclosed." *Van Anh*, 523 F.3d at 51.

### B.    Alleged Failure to Make Disclosures

Defendant argues that "the government failed to timely disclose discovery in violation of their . . . obligations pursuant to Fed. R. Crim. P. 16, Local Rules 116.1 and 116.2, *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Giglio*, 405 U.S. 150 (1972)." (ECF 135 at 1).

To the extent he claims a failure by the government to *disclose* information under *Brady* or *Giglio*, the argument is without merit.  He does not point to a single piece of exculpatory evidence that the government should have disclosed before trial but did not.  Likewise, to the extent he claims a failure to disclose information in violation of Rule 16, the Local Rules, or the Jencks Act, he does not identify any such items that should have been disclosed before trial but were not.

### C.     Alleged Timing and Volume of Disclosures

Defendant's principal contention is that the timing of certain disclosures violated the government's discovery obligations; that the government produced such a high volume of material at such a late stage in the proceeding that his counsel was unable to properly review it before the trial; and that the late-produced information included certain evidence that his counsel was unable to effectively use at trial.

The specific timing of the production of the disputed materials was apparently as follows:

On April 22, 2024, 36 days before trial, the government produced approximately 9,500 pages, consisting of medical records of Victim 1 and various Jencks Act materials, including grand-jury transcripts.  (ECF 137 Ex. 1 at 4).  It appears that the names of the victims in the grand-jury transcripts produced at that point were redacted, and that the seven victims were identified only by number.

On April 30, 2024, 28 days before trial, the government provided the defense with a 21-day discovery letter under Fed. Crim. 16 and Local Rule 116.2.  (ECF 137 Ex. 7).  Among other things, that letter identified each of the seven victims by name and identified the specific immigration benefits provided to each.  The letter indicated that all seven victims had also been granted "Continued Presence" status, and six of the seven (all but Victim 5) had been granted a T visa.  (*Id.*).

On May 3, 2024, 25 days before trial, the government produced approximately 19,000 additional pages.  (ECF 148 at 18).  Those documents included more than 18,000 pages from the DOL civil investigation file, of which more than 16,000 pages were copies of defendant's business records gathered in the course of that investigation.  Included in those materials were at least two e-mails from a DOL investigator concerning conversations with victims.  (ECF 137 Ex. 1 at 5; ECF 148 at 18-19).

On May 13, 2024, the government produced unredacted grand jury transcripts.  (ECF 148 at 17).

On May 23, 2024, five days before trial, the government (apparently) produced approximately 1,600 pages.  (ECF 137 Ex. 1 at 10).  Those documents appear to have consisted principally of CIS immigration files concerning the seven identified victims.  Included in those materials were certain statements made by the seven victims in support of their applications for immigration benefits.  (ECF 148 at 19).

### 1.    Timing of Disclosures

The initial question is whether the government violated its legal obligations to produce certain types of discovery by certain dates.

#### a.    Evidence Tending Directly to Negate Guilt

Under Local Rule 116.2(b), the government was generally obligated to produce "information that would tend directly to negate the defendant's guilt concerning any count in the indictment" within 21 days of the arraignment (that is, by May 16, 2023).  Defendant has identified no such information at all, much less information that was produced in an untimely manner.[7]

---

[7] Defendant loosely uses the term "exculpatory" to refer to any information that might arguably serve to impeach the credibility of a witness.  *See, e.g.*, ECF 135 at 10.  Such impeachment information must be produced,

### b.    Evidence of Promises, Rewards, or Inducements

Under Local Rule 116.2(b), the government was also required to produce the following

information within 21 days of the arraignment (again, by May 16, 2023):

> a statement whether any promise, reward, or inducement has been given to any witness
> whom the government anticipates calling in its case-in-chief, identifying by name each
> such witness and each promise, reward, or inducement, and a copy of any promise,
> reward, or inducement reduced to writing[.]

Local Rule 116.2(b)(1)(C).

It is undisputed that the seven alleged victims received immigration benefits, and that

those benefits represent promises, rewards, or inducements within the meaning of Rule 116.2(b).

The dispute concerns the timing and accuracy of the disclosures.

### (1)    Disclosures of Immigration Benefits

The complaint in this matter was filed under seal on March 15, 2023, and unsealed after

defendant's arrest on March 16, the next day.  (ECF 4).  Attached to the complaint was an

affidavit from Stacy Fleischmann, a Special Agent with the Department of Homeland Security,

Homeland Security Investigations.  (*Id*. Ex. 1).  Among other things, that affidavit set forth

factual allegations about the seven alleged victims in this matter, all of whom were identified by

a number rather than by name.  It was made available to the defendant no later than his initial

appearance, which occurred on March 16, 2023.

As to Victim 1, the affidavit stated the following:

> Victim 1 is a citizen of a North African country.  In 1999, he entered the United States on
> a B-2 visitor visa.  As a result, he lacked status and authorization to work.  During this
> investigation, the Department of Homeland Security has helped Victim 1 obtain
> immigration benefits.  Specifically, HSI agents helped Victim 1 receive "Continued
> Presence."  In addition, HSI has submitted certification to enable Victim 1 to obtain T
> and U visas.

---

but according to a different timetable (21 days before trial) than exculpatory information (21 days after
arraignment).  *See* Local Rule 116.2(b).

(*Id.* at 7 n.1).[8]

As to Victim 2, the affidavit stated the following:

Victim 2 is a Salvadoran national.  He entered the United States without inspection (i.e., illegally).  As a result, he lacked status and authorization to work.  During this investigation, the Department of Homeland Security has helped Victim 2 obtain immigration benefits.  Specifically, HSI agents helped Victim receive "Continued Presence" [status].

(*Id.* at 11 n.11).

The immigration statuses of Victim 3 (a Brazilian national), Victim 4 (a Salvadoran national), Victim 5 (a Brazilian national), and Victim 7 (a Salvadoran national) were described in terms that were essentially identical to Victim 2 (that is, that they had entered illegally, that HSI helped them obtain immigration benefits, and that they had received "Continued Presence" status).  (*Id.* at 16 n.20; 18 n.22; 19 n.23; 27 n.35).

As to Victim 6, the affidavit stated the following:

Victim 6 is a Brazilian national. He entered the United States on a visitor visa on June 6, 2013. Victim 6 remained in the United States beyond the period authorized by his visa. As a result, he lacked status and authorization to work. During this investigation, the Department of Homeland Security has helped Victim 6 obtain immigration benefits.

---

[8] The affidavit described "Continued Presence" status, T visas, and U visas as follows:

"Continued Presence" . . . is a temporary immigration status for potential victims of human trafficking. This status enables the recipient to remain in the United States, obtain employment, and become eligible to receive federal assistance benefits all for the duration of law enforcement's human trafficking investigation.

(*Id.* at 11 n.11).

T non-immigrant status ("T visa") is a temporary immigration benefit that enables certain victims of a severe form of trafficking in persons to remain in the United States for an initial period of up to 4 years if they have complied with any reasonable request for assistance from law enforcement in the detection, investigation, or prosecution of human trafficking or qualify for an exemption or exception.

(*Id.* at 21 n.26).

The U non-immigrant status ("U visa") is set aside for victims of certain crimes who have suffered mental or physical abuse and are helpful to law enforcement or government officials in the investigation or prosecution of criminal activity.

(*Id.* at 21 n.26).

> Specifically, HSI agents helped Victim receive "Continued Presence." In addition, HSI
> has submitted certification to enable Victim 6 to obtain T and U visas.

(*Id.* at 21 n.26).

On April 20, 2023, the government provided an automatic disclosure letter pursuant to

Fed. Crim. 16 and Local Rule 116.1(c) and 116.2.  (ECF 148 Ex. 2).  Among other things, that

letter stated:

> Promises, rewards, or inducements have been given to witnesses whom the
> government anticipates calling in its case-in-chief, specifically Victims 1 through
> 7.  Those benefits are summarized in the Complaint Affidavit, Dkt. No. 4-1, at
> footnotes 7, 11, 20, 22, 23, 26, 35.  Pursuant to Local Rule 116.6, the government
> declines to identify Victims 1 through 7 because such disclosure would be
> [detrimental] to the interests of justice, in that such identification would put them
> at risk of tampering or intimidation.

(*Id.* at 4).

It does not appear that there were any further disclosures by the government concerning

the immigration status of the seven victims for more than a year.

As noted, on April 30, 2024, the government provided a discovery letter to defendant.

(ECF 148 Ex. 7).  The letter included a chart showing that all of the victims except Victim 5 had

been granted a T visa. [9]

Some of the relevant dates are not in the record.  Nonetheless, it appears to be undisputed

that (1) Victim 2 had filed applications for a T visa and a U visa on August 9, 2021, and his T

visa was approved on April 28, 2022; (2) Victim 3 had filed applications for a T visa and a U

visa on July 9, 2021, and his T visa was approved on May 16, 2022; (3) Victim 6 had filed

applications for a T visa and a U visa on September 8, 2022 (the date of the approval of the T

visa is not in the record); and (4) Victim 7 had filed applications for a T visa and a U visa on

---

[9] It does not appear that any of the victims ever obtained U visas.

January 9, 2023 (the date of the approval of the T visa is not in the record).  (ECF 168 at 7).

None of that information was in the affidavit, which again was submitted to the court and the

defendant in March 2023.  At some point prior to April 2024—the record is unclear—Victims 1,

6, and 7 received T visas and Victim 4 applied for and received a T visa.

### (2)    <u>Analysis</u>

The government was required to produce information concerning promises, rewards, and

inducements—including immigration benefits to the alleged victims—within 28 days of

arraignment.  Local Rule 116.2(b)(1).  Based on the evidentiary record, the government violated

that obligation in multiple respects.

First, the information that it provided in March 2023 was inaccurate as to at least four of

the seven victims; Victims 2 and 3 had actually received T visas (in April 2022 and May 2022,

respectively) and Victims 6 and 7 had applied for T visas (in September 2022 and January 2023

respectively).  The government did not provide accurate information as to those four victims

until April 30, 2024, more than a year later.

As noted, it is unclear when Victims 1, 4, 6, and 7 received their T visas.  Even if they

did so after the submission of the March 2023 affidavit, the government should have provided

that information promptly; it was under a duty, if it learned that a prior disclosure was in some

respect inaccurate or incomplete, to supplement promptly any required disclosure.  Local Rule

116.7.  The government did not supplement its response concerning any of the immigration

benefits until April 30, 2024.

The difference between receiving "Continued Presence" status and a T visa is material.

"Continued Presence" is a temporary status during the pendency of an investigation; a T visa is

for a four-year period, is renewable, and provides a pathway to potential citizenship.  (ECF 4 Ex.

1 at 11 n.11; 21 n.26).  The government does not offer a reason for its failure to provide accurate and timely information concerning the immigration status of the victims.  Moreover, it continues to contend that the information provided in April 2024 was merely "duplicative" of the information provided in March 2023, which plainly it was not.  (ECF 148 at 17).  Nonetheless, it does not follow that a new trial is warranted on that basis.

To begin, it is beyond dispute that defendant was aware from the outset of the case that the victims were receiving immigration benefits in return for their cooperation with the government.  For example, at the initial probable cause and detention hearing, fourteen months before the start of the trial, counsel for defendant argued:  "[W]e have seven people, all have real personal incentive to fabricate. . . . they have already been rewarded by [being] given extended stay[s] in this country and applications and assistance by Homeland Security in obtaining new visas. . . . [t]hat is a huge, huge incentive for them to fabricate."  (ECF 22 Ex. 1 at 72-74).

When the government finally disclosed—on April 30, 2024, 28 days before trial—that the applications for T visas as to six of the seven defendants had actually been approved, it can hardly have been a surprise to the defense.[10]  The defense theory that the victims had a powerful incentive to fabricate their testimony in order to obtain immigration benefits was virtually unaffected by the late disclosure.  Indeed, under the circumstances, there was little difference between the government's promise of immigration benefits and the actual granting of those benefits.

More importantly, defense counsel vigorously cross-examined the victims on the subject of their desire to obtain immigration benefits and their strong motive to fabricate their testimony.

---

[10] Indeed, the defense argued at the detention hearing that "each and every victim" had received "extended stay" status and that Homeland Security "has assisted them with getting visas."  (ECF 22 Ex. 2 at 24).

The jury had a full opportunity to evaluate the credibility of the victims, and to consider their testimony in light of their potential motives to fabricate.

Under the circumstances, defendant has not shown that the government's violation of its disclosure obligations with respect to the immigration benefits provided to the victims created a reasonable probability of a different result at trial. The motion for new trial will not be granted on that basis.

**c.     <ins>Disclosures of Victim and Witness Statements</ins>**

An area of potentially greater concern involves the timing of the government's production of victim and witness statements. Under Local Rule 116.2(b)(2), the government was required to disclose potential impeachment material not later than 21 days before the trial date— that is, by April 29, 2024 (21 days before the original trial date) or at the latest by May 7, 2024 (21 days before the actual trial date). Certain portions of that material were provided in advance of that deadline, on April 22 (when medical records and grand jury transcripts were produced) and May 3 (when the DOL file was produced). Some portions, however, were not produced until May 23 (when the immigration files were produced).

Defendant contends that he was unfairly prejudiced both by the late disclosures of the immigration files and, even as to the timely disclosures, the sheer volume of the production of documents on the eve of trial.

**(1)     <ins>The Government's Production Generally</ins>**

As an initial matter, it appears to be largely undisputed that the government violated its disclosure obligations under Local Rule 116.2(b)(2) as to the immigration files. To the extent those files contained potential witness-impeachment material, they should have been produced no later than May 7, 2024, 21 days before trial. Instead, they were produced on May 23, five days before trial.

19

It is difficult to discern why the government produced the files in the manner that it did. It is true that it was under no obligation to produce witness-impeachment information until 21 days before trial, and no technical obligation to produce Jencks Act material as to any witness at any point before the conclusion of direct testimony.  Nonetheless, it was surely obvious to everyone involved that the success of the prosecution turned on the testimony of the seven identified victims, and therefore on their credibility.  It likewise should have been obvious that some or all of those victims had made statements to DOL investigators in the civil investigation; that they had made statements to CIS in connection with their applications for immigration benefits; that those statements would likely contain at least some potential impeachment information; and that defense counsel would have a strong interest in obtaining those statements.[11]

Whatever the government did to organize those files for production, it appears to have been undertaken, at least in part, in a haphazard and last-minute fashion.  It now states that "[d]espite [its] best efforts, certain of the immigration files were not produced 21 days before trial, due to logistical difficulties beyond [its] control."  (ECF 170 at 15).  But there is no obvious reason why the documents could not have been made ready for production well in advance of the 21-day deadline, so that any such logistical difficulties—which were not entirely unforeseeable—could be resolved.

The government offers only a weak defense of its approach.  It takes the position that "arguably [it] did not have [a] duty" to obtain the DOL or CIS immigration records at issue because those agencies were not part of the prosecution team.  (ECF 170 at 8).  That is hardly a

---

[11] It may have been permissible for the government to withhold victims' names to guard against retaliation, as it argues in its opposition.  (ECF 148 at 17 n.6).  Nevertheless, withholding that information for most of the discovery period made it all the more important for the government to adhere scrupulously to the 21-day deadline.

compelling argument; this is not a situation in which the defense seeks to hold the government responsible for searching the files of a wholly independent state or local agency, or even another federal agency that had no direct role in the prosecution.  The government was very much aware of the involvement of CIS (and DOL), and the fact that all seven victims were being interviewed for possible immigration benefits.  Indeed, CIS is an agency of the Department of Homeland Security, and Homeland Security Investigations was the lead law-enforcement agency on the case.

In any event, and regardless of the reason, the government produced potential witness-impeachment material less than 21 days before trial, in violation of its obligations under Local Rule 116.2(b)(2).  Before turning to the potential impact of that violation, the Court will address the issue of the volume of discovery produced by the government in the weeks before trial.

### (2)    The Volume of Disclosures

Defendant contends that the pretrial discovery disclosures—even those that were timely—were so voluminous that his counsel was unable to review the documents effectively prior to the trial.  Despite defendant's repeated references to the raw numbers of pages included in the government's productions, that is not the dispositive issue.  It might be possible, in some circumstances, that a late deluge of discovery would serve to obscure critical facts to such a degree that it violates the defendant's due-process or other constitutional rights.  But that is not the case here.

To begin, the immateriality of much of the production could have been determined at a mere glance.  Again, the materials in question consist in very large part of two sets of documents:  (1) documents from the DOL concerning the civil investigation into wage-and-hour violations at defendant's restaurants, and (2) documents from CIS concerning the immigration

status of the seven identified victims.  Of the 18,000 pages of documents related to the DOL

investigation, the government estimates that 16,000 pages of that production consisted of

defendant's payroll and other business records.  (ECF 148 at 18).  The defendant, of course, was

a party to that litigation, and those records were his own documents, produced back to him.  The

contents of the CIS files are not clear from the record, but surely substantial portions of that

evidence were government forms and similar types of documents that did not contain victim

statements.

It is nonetheless true that the DOL production did in fact include victim statements, and

internal emails reflecting such statements, that had not been produced to defendant in the course

of the DOL civil proceeding.  It is also true that the immigration files contained sworn victim

statements and other potential impeachment material (such as applications for visas for family

members or prior deportation proceedings).  As noted, that information should have been

produced no later than 21 days before trial.  But the defendant's contention that those statements,

and that information, could not reasonably have been located in time to make effective use of

them at trial is considerably exaggerated.

The government contends—and defendant does not dispute—that the documents in

question were produced in an organized manner, with an accompanying index.[12]  Again, it

appears that all of the documents were written in the English language, and that all of the

disputed victim statements were relatively brief.

It is also noteworthy that this case did not involve a complex white-collar criminal

prosecution or allegations of a significant criminal conspiracy or racketeering enterprise.  There

---

[12] Defendant contends that the index was inadequate.  According to the government, however, it was the same index the government used in its review of the documents.

was a single defendant.  There were seven identified victims, all of whom held relatively low-level positions at defendant's pizza shops, and all of whom were known to the defendant.  The subject matter of the prosecution involved a discrete number of episodes of threats or abuse while those individuals were working for defendant.  And there was no technical or expert evidence.

Finally, and perhaps most critically, the defense team did not comprise a single lawyer.  Defendant was represented by four counsel, all of whom were experienced and capable.  Those four lawyers were assisted by a paralegal with a law degree.  To the extent that the files required a review to identify the presence of victim statements—a task that cannot have been insurmountably difficult, under the circumstances—the work was spread over five attorneys.

In short, defendant substantially overstates the burden imposed by the volume of the production.  Under the circumstances, the fact that the government produced thousands of pages of documents relatively close to trial, without more, did not burden the defense to such a degree that it rendered the trial fundamentally unfair.

### (3)    Specific Late-Disclosed Items

There remains the questions of the effect of the late disclosure of specific items.

Defendant points to only four specific items that he contends were not produced in sufficient time for him to make effective use of them at trial.  The first two items concern immigration benefits promised to Victims 7 and 3:

> [T]here is an email dated February 6, 2018 in which DOL Investigator Heather Burton . . . requests the "U visa script" in Spanish.  Based on the facts disclosed in the email, this request is in reference to Julio Cesar Yanes Reyes (Victim 7).  Burton also inquires whether the "DOJ list" can be shared directly with the employee.  As far as defense counsel is aware, this is the only evidence in any of the discovery disclosing the point at which an alleged victim is told about T and U visas and potentially provided legal counsel.

> The next morning, Carmo (Victim 3) contacted Burton, and provided a statement on February 12, 2018. Carmo also states that he "heard about what he did to Julio" and "If you can guarantee I won't get deported. I have a wife and a baby coming. I will go to court for you if you can guarantee I won't get deported."

(ECF 135 at 11).

It is unclear why that information is not, in substance, cumulative. Defense counsel was aware that the victims desired immigration benefits; aware that the government was assisting them to obtain those benefits; and aware that many of the victims knew each other and spoke about their shared experiences and their desire to obtain benefits. If there is a reason why those particular disclosures have such special significance that their late disclosure rendered the entire trial unfair, it is not evident from the record.

The third item concerns Victim 4:

> On February 14, 2018, [Bonilla] (Victim 4) contacted DOL to supposedly provide an updated address. She had not spoken to the DOL since August of 2016. In her 2016 statements, she makes no mention of any fear, ill treatment, threats, and certainly nothing about witnessing any assault on Teixeira (Victim 5).

(*Id.*). Even assuming that Bonilla had failed to mention those facts, under circumstances where she might have been expected to do so, the potential impact on her credibility was surely relatively minor, and does not warrant a new trial.

Finally, the defense argues that it was unable to make use of a statement given by Victim 4 to HSI agents in which she describes witnessing her father's murder as a young girl. (ECF 137 Ex. 22 at 5). Victim 4 testified about that event during trial. Defendant asserts that he was prejudiced because he "did not know that the government would [e]licit th[at] testimony as it was irrelevant absent some showing that the defendant knew about [Victim 4's] special vulnerability," and because Victim 4 did not discuss her experience in other testimony or witness statements. (ECF 135 at 14).

That information in fact had been produced by the government, in substance, on August 15, 2023.  An HSI report produced that day included a description by Victim 3 of defendant's attack on Victim 5.  It states in part:  "In addition to Victim 3[,] Silvia Bonilla [Victim 4], who is from El Salvador, was also working that day.  Bonilla got scared and was traumatized by the incident.  At a young age, Bonilla had seen her father get murdered in front of her."  (ECF 148 Ex. 6 at 8).  Neither that evidence, nor defendant's explanation as to its purportedly prejudicial nature, is exculpatory.  Nor does it bear on Victim 4's credibility, particularly as she testified consistently with her prior statement.  In any event, whether that evidence was improperly admitted at trial is not the inquiry here; it is whether it was properly disclosed in discovery in a manner that permitted defense counsel to make effective use of it.  Based on the available evidence, it clearly was.

### D.  Defendant's Cell Phone

Defendant further contends that the government did not provide adequate access to the contents of his cell phone, which had been seized by the government when he was arrested on March 16, 2023.  As noted, the government took the position that the phone contained a video image of child pornography, and therefore refused to provide a download of the contents of the phone to the defense.  Nonetheless, the government did provide unrestricted access to the phone to the defense upon request, including providing transportation of the defendant from the jail to view the contents of the phone in government custody.  There were three such sessions; there is nothing in the record to suggest that the defense wanted more sessions but was refused.

It is unclear, to be sure, why the government acted as it did—for example, why it did not simply provide the defense with a partial download of the contents of the phone.  Nonetheless, defendant has not come close to demonstrating any unfair prejudice requiring a new trial.

Again, the cell phone at issue was defendant's own phone.  If there was information on it that was critical to his defense, surely he could have located it without undue trouble.  Defendant has not provided any reason why locating such information would have been unduly difficult, other than to state in general terms that there was a great deal of information stored on his phone. Indeed, he has not pointed to a single item from the phone that he was unable to obtain access to before the trial, or otherwise unable to use effectively in his defense.

In any event, if defendant had serious objections to the conditions of his access to his phone before trial, he should have raised the issue with the Court well before the trial.  It is unfair to fail to seek such relief during the discovery period, only to raise the issue after trial and conviction.  The Court will not grant a new trial on that basis.

### E.    Alleged Prejudice

In summary, defendant has not shown a reasonable probability that, had any of the challenged evidence been disclosed earlier, the result of the proceeding would have been any different.  Defendant has identified no evidence—from the DOL materials, the immigration files, or his own cell phone—that would potentially have affected the outcome of the case in any material way.  Defendant likewise has not made a *prima facie* showing that the alleged late production of the challenged evidence foreclosed any plausible strategic option for his defense. Defense counsel thoroughly cross-examined each victim concerning their expectation of immigration benefits they received in exchange for their cooperation with law enforcement, and the issue of possible witness collusion was likewise explored at some length.

Accordingly, for the foregoing reasons, defendant has not satisfied the standard for a new trial under Rule 33.[13]

### F.    Requested Continuance

Defendant also contends that the Court abused its discretion by granting only a partial continuance of the scheduled trial date.

"Trial courts are granted broad discretion in scheduling trials and ruling on motions for continuances." *Delgado-Marrero*, 744 F.3d at 195. "Only 'an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay' constitutes an abuse of that discretion." *United States v. Saccoccia*, 58 F.3d 754, 770 (1st Cir.1995) (quoting *Morris v. Slappy*, 461 U.S. 1, 11-12 (1983)). A denial of a continuance will only be an abuse of discretion "if no reasonable person could agree with the judge's ruling," and "the party denied the continuance [shows] that the judge's decision caused specific, 'substantial prejudice.'" *United States v. Maldonado*, 708 F.3d 38, 42 (1st Cir. 2013) (quoting *Saccoccia*, 58 F.3d at 770).

The Court explained its reasoning for denying defendant's requested continuance during a hearing on the motion on May 9, 2024. (ECF 148 Ex. 5 at 30-38). It considered, among other things, the complexity of the case, the diligence of counsel, the lack of any specific identified needs, the inconvenience to the court and the parties, the nature of the purportedly late-disclosed evidence, and the likelihood of any prejudice resulting from the denial of the continuance. (*Id.*). Defendant has submitted no new evidence or material of any kind that would require disturbing those findings. In any event, defendant has also failed to meet his burden in a more fundamental respect—he has not shown, or even specifically alleged, any way in which the granting of an

---

[13] To the extent that the motion further requests an order compelling the production of the entire contents of defendant's cell phone, that request is also denied in light of the ongoing concern that the cell phone contains child pornography. *See* 18 U.S.C. § 3509(m).

eight-day continuance, rather than the 145 days he requested, caused any specific and substantial prejudice. Without any such showing, the lack of a longer continuance does not provide any ground for a new trial under Rule 33.

**IV.**   **Conclusion**

For the foregoing reasons, defendant's motion for a new trial is DENIED.

**So Ordered.**

<table>
<tr><td></td><td>/s/ F. Dennis Saylor IV</td></tr>
<tr><td></td><td>F. Dennis Saylor IV</td></tr>
<tr><td>Dated:  January 17, 2025</td><td>Chief Judge, United States District Court</td></tr>
</table>